## HYMAN *v.* READ.

ROYAL grants, made at the solicitation of the grantee, are to be construed liberally for the King. But, when made *ex mero motu regis,* the construction is in favor of the grantee.

Legislative grants are to be construed liberally in favor of the grantee.

The Act of March, 1851, commonly called the San Francisco Water Lot Act, should be construed favorably to the city, and includes all land within the boundaries fixed by the survey referred to in the Act.

Nothing in the Act of May, 1851, indicates any intention on the part of the Legislature to exclude the public slips from the Act of March.

APPEAL from the Twelfth District.

Ejectment for a lot, being part of what was formerly known as the City Slip, bounded by Clay, Davis, and Sacramento streets and the waters of the bay, in the city of San Francisco.

It is deemed unnecessary to state the facts. The whole controversy was as to the construction of the Act of March, 1851, known as the Water Lot Act, relative to San Francisco, and the Act of May, 1851, referred to in the opinion. And the question was, whether the title to what are called "slips," that is, water lots surrounded on three sides by wharfs, etc. and opening out into the bay, and not divided into "lots," technically speaking, at the time of the passage of the Act of March, 1851, vested under that Act in the city of San Francisco, or whether those "slips" remained the property of the State, subject to sale under the Act of May 18th, 1853, appointing Commissioners to sell the State's interest in the water lot property in San Francisco, and the Act of May 1st, 1855, supplementary thereto.

Plaintiff claimed under the Act of 1855; defendant under the city, through the Act of March, 1851.

Defendant had judgment, and plaintiff appeals.

*Heydenfeldt,* for Appellant.

The first section of the Act of 1851, is devoted exclusively to a description of the property, and I direct particular attention to the salient points of description. The points are—

1st. All the *lots* of land.

2d. According to the survey of the city.

3d. According to the map of the same.

4th. Are known and designated as the San Francisco Beach and Water Lots. By the second section of the Act, "the use and occupation of all the land described in the first section," is granted to the city for ninety-nine years.

What is "the land" described, and made the subject matter exclusively in the first section?

It is, beyond dispute, "the beach and water lots, according to the survey and the map." Then the question arises, can the strip which has been described pass under the denomination of "lot of land?" Upon examining the map it will be seen, that all the property within the lines described in the Act

of 1851 is divided and subdivided into lots of different sizes, with the exception of the space occupied by this slip. Now, it is clear, upon authority and principle, that the map must be taken not only as explanatory of the grant, but as a part of it. (*Lincoln* v. *Wilder*, 29 Maine, 169; *Davis* v. *Rainsford*, 17 Mass. 207; *Sutherland* v. *Jackson*, 32 Maine, 80; *Blake* v. *Doherty*, 5 Wheat. 359.) The city took "lots" according to the map. What is a lot? The rule is to give to words the meaning which is commonly accepted. This word, as applied to land, is purely an American application. Webster is the only orthoepist who mentions the sense in which it is used in this connection. He says: "In the United States a piece or division of land;" and he illustrates it thus: "So we say, a man has a lot of land in Broadway, or in the meadow; he has a lot on the plain, or on the mountain; he has a home-lot, a house-lot, a wood-lot."

Now, in the Act of 1851, the Legislature speaks of pieces and subdivisions, as shown upon the map, as commonly and universally recognized as lots, according to American usage, and only of such as were so recognized. If, therefore, any portion of it would not in common parlance be called a "lot of land," it cannot be deemed within the description. Besides, if they intended to grant all the land independent of its apparent subdivisions on the map, how easy, indeed how much easier, it would have been to have done so. For the Act describes two lines, an interior or land line, and an exterior or water line. How simple it would have been to grant all the land lying within these two lines, instead of "the San Francisco Beach and Water Lots, according to the survey and the map of said city on file in the Recorder's office."

Again: Something is due to contemporaneous legislative exposition. About one month after the passage of the above named Act, the same Legislature passed another Act entitled "An Act in relation to the City of San Francisco." (See Acts of 1851, 311.) This has been commonly called "the Second Water Lot Bill." Its first section gives the city the right to construct wharfs at the ends of streets, etc. The second section relinquishes the right of the State to the beach and water lot property, upon the express conditions that the city shall confirm the titles to lots granted by Justices of the Peace, and

it confirms them on behalf of the State, and closes with this provision: "that this Act shall not be construed as confirming grants to the property known as the Public Slip, bounded by Davis, Clay, and Sacramento streets."

I insist, therefore, that the Legislature disclose by this proviso, that they knew of the existence of this property and its uses as a slip, and did not know it as a lot of land; and the inference is irresistible, that as they excluded it from passing for the purposes of the second Act, they never intended it should pass by the first Act.

I invoke another rule of instruction, to wit: that grants by the sovereign must be construed most beneficially for the sovereign. (2 Blac. 347; *Canal Co.* v. *Wheely,* 2 Barn. & Adol. 792; *Hall Dock Co.* v. *La March,* 8 B. & C. 51; *Canal Co.* v. *Hastler,* 1 B. C. 424; *U. S.* v. *Arredondo,* 6 Pet. 738, and authorities cited; *Charles R. Bridge* v. *W. Bridge,* 11 Pet. 545; *Mayor* v. *The O. & P. R. R. Co.* 26 Penn. 355; *McLeod* v. *Burroughs,* 9 Geo. 213; *Townsend* v. *Brown,* 4 Zabr. 80; *Plank Road* v. *Elmer,* 1 Stock. 754; 8 Porter 9.)

Again: Land does not pass as appurtenant to other land; it must pass only by its own description in the deed. (*Cole* v. *Haynes,* 22 Vt. 588; *Chinaweth* v. *Haskell,* 3 Pet. 96; *State* v. *Clements,* 32 Maine, 297.)

*Hoge & Wilson,* for Respondent.

The phrase "Beach and Water Lots," was the common designation of all the lands on the east part of San Francisco, between point Rincon and Fort Montgomery, from 1847, down to the passage of the Act of March, 1851. (See the Kearny Grant; Captain Halleck's report as Secretary of State to Governor Mason, made before the land was divided into what are strictly city "lots"; also, the survey made by the City Surveyor in 1847, when Bryant was Alcalde.)

These surveys left undivided into town lots, within the boundaries of the Water Lot Act of 1851, and lying in larger lots or blocks, the following lands, viz: All east of Front Street, between Vallejo and Pacific; all east of Davis, between Pacific and Jackson; all east of Front, between Jackson and Washington; all east of Drumm, between Washington and Clay; all

east of Davis, between Clay and Sacramento; two fractional blocks, and one small block, off Rincon Point; and also, *all the land covered with water, nearly two miles in length, from the site of Fort Montgomery toward the Golden Gate, and a like tract about a mile in length from Rincon Point south to Mission Creek. None of these tracts were divided into those small subdivisions called town lots.*

Prior to the first Water Lot Act, and in the early settlement of San Francisco, great doubt existed as to the rights of the town and the powers of the officers of the government. General Kearny, conceiving himself to have the power as Governor, clearly intended to cede to the town the entire bulk of the overflowed land between Rincon Point and Fort Montgomery, which would make a line about like or near the present city front. He meant by the phrase, "the Beach and Water Lots," the land— "the ground"—in that boundary, and did not use the word "lots" as "subdivisions as shown upon the map." It was then supposed that the town, by surveying "the ground" into those small "subdivisions," after that grant, and selling them could convey to the purchasers perfect titles, and had this been true, "blocks" never laid out would just as much have belonged to the town as those that were subdivided, and could at any time afterward have been laid out, subdivided, and sold. Subsequently it was discovered that the "Kearny grant" had no validity, and the doctrine of the case of *Pollard's Lessee* v. *Hagan,* 3 How. S. C. U. S. R. 212, followed afterward by *Good Title* v. *Kibbe,* 9 Id. 477; *Doe* v. *Kibbe,* 13 Id. 25, became the prevailing doctrine, and the title was by all avowed to be in the State of California. It was upon this basis that the Water Lot Act was passed. This Act was passed in the main to carry out and confirm all that had been done under the Kearny grant, but not merely that. Had it been intended only to convey to the city and her grantees the *lots*—that is, those small subdivisions called city lots—and in the limited sense that counsel uses the word, the boundary of the Water Lot Act of March 26th, 1851, would have been identical with that of Kearny's grant, *for all the surveys and subdivisions into such lots were before then inside of and in pursuance of the Kearny grant, and on the assumption of its validity.* But that Act does not stop with the Kearny grant, but extends about two miles north and west, and about one mile south and

west into a great mass of water property, never surveyed or even platted into town lots before that Act, which was passed by the Legislature, with a knowledge of all the facts, and refers on its face to the Kearny grant; the sales made by the city under that grant; the Government Reservation, and the leases by the government officers.

All the land in the boundaries of the Kearny grant, was called "the beach and water lots," or in other words, all the water property claimed by the town, was called "the beach and water lots." The Legislature, besides granting, enlarged the boundary of the water property of the city, and applied to it the same appellation of "the beach and water lots," which it borrowed from the Kearny grant. As the Kearny grant laid down a distinct boundary, and called the land within it, "the beach and water lots," so Section 1 of the Act of 26th March, 1851, lays down a certain boundary, and designates the land within it as the "beach and water lots." That phrase had assumed a peculiar and somewhat technical signification, and was used by the Legislature in that sense, being in fact, synonymous with "water property." The State claimed and owned the whole of the property within the boundaries, as well the tracts and blocks, not divided, as the smaller subdivisions, called town lots; she was making a donation to her great commercial city, and establishing a permanent boundary line or water front, and no good reason would seem to exist for such distinction by the State, between different parts of the property within the boundaries, nor for such an implied reservation, when she does make other express reservations. Where there are express reservations, there cannot be implied ones. *Expressio unius, exclusio alterius.* Why was not "the permanent water front" of San Francisco made on the line of the small subdivided city lots? Why were large blocks, squares, and irregular tracts, left between those small lots and that permanent front? What was the policy of the State in ceding any of this property to the city? Did not that policy dictate a cession of the blocks as well as the lots?

Counsel further argued, that legislative exposition was with Respondent; citing Act May 1st, 1851, showing that the line of the "permanent water front" of the city, under the Act of March, 1851, is the outside line of the beach and water lots.

The reference to " the survey of the city of San Francisco and the map or plat of the same," was not made in the Act of March 26th, for the purpose of showing what lots had been laid out, subdivided, and numbered, but for the purpose of fixing the boundaries only. The language of the Act is not, " all the lots " laid out on " the map or plats of the same," etc. but, " all the lots of land situate with the following boundaries, according to the survey of the city of San Francisco, and the map or plat," etc. that is, " the boundaries according to the survey," etc.

The fact is, that the Act of March 26th, assumed that many streets were extended beyond what they were in fact, and made a boundary to correspond thereto, without any map being platted and in existence, that precisely agreed with the Act. ( *Wood* v. *San Francisco,* 4 Cal. 193, 194.) In the case of *Holland* v. *The City of San Francisco,* (7 Cal. 361,) the city slip is expressly decided to be a part of the beach and water lot property, and to have actually passed by the Act of 26th March, 1851, to the city, for ninety-nine years.

*McDougall & Sharp,* and *F. M. Haight,* also for Respondent, filed separate briefs, maintaining similar views to those contained in the foregoing brief; and the former, against the point of Appellant, that the grant in question must be construed in favor of the grantor, cited: 2 Blac. 347; *United States* v. *Arredondo,* (6 Peters, 738;) and argued that the general doctrine as to royal grants has no existence in this country; that we have no such thing as grants by the grace of the crown, at the suit of the subject; nor any such thing as grants " *ex speciali gratia, certa scientia, et mero motu;*" that all grants, with us, are supposed to be made for some sufficient consideration, moving the government as well as individuals, and, therefore, according to the note cited from Blackstone, stand upon the same ground with private grants; and, further, that grants to private corporations, *ex gratia,* stand upon very different grounds, from grants to private persons; that this grant to the city of San Francisco, is not within any of the rules cited, nor within their reason; it was to the city of San Francisco, itself a department of the government, for the purposes of better administration; and the act, according to settled rules of construction, is to be construed liberally, for the maintenance of the administration.

TERRY, C. J. delivered the opinion of the Court—FIELD, J. concurring.

This is an action of ejectment, for a lot in that portion of San Francisco known as the City Slip. Plaintiffs claim under a purchase from the State Land Commissioner, and the defendant sets up title in the city, under the Act of March, 1851, commonly called the Water Lot Act.

The decision involves a construction of the Water Lot Act—the main question being, whether the lot in question forms a part of the property granted to the city by the terms of that Act. It was, at the time of the passage of the Act in question, part of an open slip, inclosed on three sides by wharfs, and open toward the bay, so that vessels could sail in and out.

The language of the first section is : " All lots of land situated within the following boundaries, according to the survey of the city of San Francisco, and the map or plat of the same now on record in the office of the county of San Francisco, and known and designated in this Act as beach and water lots." The section then proceeds to give the boundaries within which all the lots mentioned are situated. The second section provides that " the use and occupation of all the land described in the first section of this Act is hereby granted to the city of San Francisco," etc.

If this were a grant from an individual, there can be no doubt that the words used would be sufficient to pass all the land included in the general boundaries, whether laid off in lots or not. It is, however, contended by Appellant that grants from the sovereign are subject to a rule of construction different from that of grants of private persons ; that the language of the Act does not clearly indicate the intention of the Legislature to grant any land, except such as was designated as " water lots " on the map referred to ; that the Act must be construed most favorably to the grantor, and, therefore, the premises in question did not pass by it.

We are by no means satisfied that the statute is justly amenable to the charge of ambiguity, tested by ordinary rules. It appears sufficiently to indicate the intention to grant all the *land* included in the boundary designated. The grant is not *of lots of land according to the survey, but of all lots of land within boundaries*

*fixed by reference to the survey.* The survey is not referred to as determining the boundaries respectively of the lots granted, but of the territory which included all the lots. We can see nothing in the language of the Act of May, 1851, which discloses an intention on the part of the Legislature to exclude the public slip from the operation of the Act of March. The Act of May, which confirmed certain grants known as Colton grants, made by an Alcalde to individuals, provided, " that this Act shall not be construed as *confirming grants* to the property known as the public slip, bounded by Davis, Clay, and Sacramento streets."

The land, at the time, was an open slip, used for the purposes of commerce, and, in order that the city might continue to use it in this manner, the Legislature refused to confirm grants to portions of it which had been made to individuals, the effect of such confirmation being to deprive the city of control over it.

But admitting for the purposes of the argument, that the language of the Act is uncertain and ambiguous, we think the Appellant has failed to establish his legal proposition, that the grant should receive a strict construction in favor of the grantor.

The rule for construing grants from the King is thus laid down by Blackstone, (2 Com. 347) : " A grant made by the King, at the suit of the grantee, shall be taken most beneficially for the King, and against the party; *whereas,* the grant of a subject is construed most strongly against the grantor. Wherefore, it is usual to insert in the King's grants that they are made, not at the suit of the grantee, but ' *ex speciala gratia, certa scientia, et mero motu regis ;*' and, then, they have a more liberal construction." In Note 4 to this text, it is said, " Royal grants, for a valuable consideration, are also liberally construed in favor of the grantee."

The construction and leaning shall be in favor of the subjects, if the grant show that it was not made at the solicitation of the grantee, but *ex speciala gratia, certa scientia, et mero motu regis.* " The grants of the King, when valid in general, bind him, though without consideration, as subjects are bound by their grants." (Chitty on Prerogative, Chap. 16, Sec. 5.)

A very thorough examination of this question was made by Judge Story, in the case of *Charles River Bridge* v. *Warren Bridge et al.* (11 Peters, commencing page 589.) The opinion of Judge Story on this question, which was not necessary to the

decision of the case, has not the force of a judicial decision, but being the deliberate and carefully elaborated conclusion of a very learned and able jurist, upon a point presented and solemnly argued in the case before him, it is entitled to the utmost respect, especially as it is sustained by cogent reasoning, and by reference to authorities.  He says: "It is a well known rule in the construction of private grants, if the meaning of the words be doubtful, to construe them most strongly against the grantor. But it is said that an opposite rule prevails in cases of grants by the King; for, where there is any doubt, the construction is made most favorably for the King and against the grantee.  The rule is not disputed.  But it is a rule of very limited application.  To what cases does it apply?  To such cases, only, where there is a real doubt, where the grant admits of two interpretations, one of which is more extensive, and the other more restricted, so that a choice is fairly open, and either may be adopted without any violation of the apparent objects of the grant.  If the King's grant admits of two interpretations, one of which will make it utterly void and worthless, and the other will give it a reasonable effect, then the latter is to prevail; for the reason (says the common law) " that it will be more for the *benefit* of the subject and the *honor* of the King, which is to be more regarded than his profit."  (Com. Dig. Grant, G. 12; 9 Co. R. 131, a; 10 Id. 67, b.; 6 Id. 6.)  And in every case the rule is made to bend to the real justice and integrity of the case.  No strained or extravagant construction is to be made in favor of the King.  And if the intention of the grant is obvious, a fair and liberal interpretation of its terms is enforced.  The rule itself is also expressly dispensed with in all cases where the grant appears upon its face, to flow, not from the solicitation of the subject, but from the special grace, certain knowledge, and mere motion of the crown, or, as it stands in the old royal patents, ' *ex speciali gratia, certa scientia, et ex mero motu regis.*'  (See Arthur Legate's Case, 10 Co. R. 109, 112, b.; Sir John Moulin's Case, 6 Id. 6; 2 Black. Com. 347; Com. Dig. Grant, G. 12,) and these words are accordingly inserted in most of the modern grants of the crown, in order to exclude any narrow construction of them.  So the Court admitted the doctrine to be in *Attorney-General* v. *Lord Eardly*, (8 Price, 69).  But what is a most important qualification of the rule, it never did

apply to grants made for a valuable consideration by the crown, for in such grants the same rule has always prevailed, as in cases between subjects. The mere grant of a bounty of the King may properly be restricted to its obvious intent. But the contracts of the King for value are liberally expounded that the dignity and justice of the government may never be jeoparded by petty evasions and technical subtilties."

Again, on page 590, he says, "So in respect to implications in cases of royal grants, there is not the slightest difficulty, either upon authority or principle, in giving them a large effect so as to include things which are capable of being the subject of a distinct grant. A very remarkable instance of this sort arose under the statute of prerogative, (17 Edw. 11, Stat. 2, Ch. 15,) which declared that when the King granteth to any a manor or land, with the appurtenances, unless he makes express mention in the deed, in writing, of advowsons, etc. belonging to such manor, then the King reserveth to himself such advowsons. Here, the statute itself prescribed a strict rule of interpretation. Yet, in *Whistler's Case*, (10 Co. R. 63,) it was held that a royal grant of a manor, with the appurtenances, in as ample a manner as it came to the King's hands, conveyed an advowson which was appendant to the manor by implication from the words actually used, and the apparent intent. This was certainly a very strong case of raising an implication from words susceptible of different interpretations, where the statute had furnished a positive rule for a narrow construction, excluding the advowson. So it has been decided that if the King grants a messuage and all land *spectantes, aut cum eo dismissas*, lands which have been enjoyed with it for a convenient time, pass. (2 Rolle Abridg. 186, C. 25, 30; Cro. Car. 169; Chitty on the Prerogatives, Ch. 16, S. 3, 393; Com. Dig. Grant, G. 5.) In short, wherever the intent from the words is clear, or possesses a reasonable certainty, the same construction prevails in crown grants as in private grants; especially where the grant is presumed to be from the voluntary bounty of the crown, and not from the representation of the subject."

Again, on page 596, he says: "But what, I repeat, is most material to be stated, is, that all this doctrine in relation to the King's prerogative of having a construction in his own favor, is

exclusively confined to cases of mere *donation*, flowing from the bounty of the crown.   Whenever the grant is upon a valuable consideration, the rule of construction ceases, and the grant is expounded exactly as it would be in the case of a private grant, favorably to the grantee.   Why is this rule adopted?   Plainly, because the grant is a contract, and is to be interpreted according to its fair meaning.   It would be to the dishonor of the government, that it should pocket a fair consideration, and then quibble as to the obscurities and implications of its own contract.   Such was the doctrine of my Lord Coke, and of the venerable sages of the law in other times, when a resistance to prerogative was equivalent to removal from office.   Even in the worst ages of arbitrary power, and irresistible prerogative, they did not hesitate to declare that contracts founded on a valuable consideration ought to be construed liberally for the subject, for the honor of the crown.   (2 Co. Inst. 496.   See, also, Com. Dig. Franchise C. F. 6.)   If we are to have the grants of the Legislature construed by the rules applicable to royal grants, it is but common justice to follow them throughout for the honor of this Republic.   The justice of the commonwealth, will not (I trust) be deemed less extensive than that of the crown."

The case of Arredondo, (6 Peters,) does not, as we conceive, conflict with this view, inasmuch as the grant then under consideration, was a grant from the sovereign, made *at the suit of the grantee.*

But, if we are mistaken as to the rule of construction applicable to grants from the crown, there is no doubt that both on principle and authority, a legislative grant should be construed liberally in favor of the grantee.   We again quote from 11 Peters, 597: "The present, however, is not the case of a royal grant, but of a legislative grant, by a public statute.   The rules of the common law in relation to royal grants have, therefore, in reality, nothing to do with the case."   We are to give this act of incorporation a rational and fair construction, according to the general rules which govern in all cases of the exposition of public statutes.   We are to ascertain the legislative intent; and that once ascertained, it is our duty to give it a full and liberal operation.  · The books are full of cases to this effect, (see Com. Dig. Parliament, 10—28; Bac. Abridg. Statute,) if, indeed,

so plain a principle of common sense and common justice stood in any need of authority to support it. Lord Chief Justice Eyre, in the case of *Boulton* v. *Bull*, (2 H. 136, 463, 500,) took notice of the distinction between the construction of a crown grant, and a grant by an Act of Parliament; and held the rules of the common law, introduced for the protection of the crown in respect to its own grants, to be inapplicable to a grant by an Act of Parliament. "It is observed," said his Lordship, "that there is nothing technical in the composition of an Act of Parliament, In the exposition of statutes, the intent of Parliament is the guide. It is expressly laid down in our books, (I do not here speak of penal statutes,) that every statute ought to be expounded, not according to the letter, but the intent." Again, he said : "This case was compared to the case of the King being deceived in his grants. But I am not satisfied that the King, proceeding by and with the advice of Parliament, is in that situation, in respect to which he is under the special protection of the law; and that he could on that ground be considered as deceived in his grant. No case was cited to prove that position.

Now, it is to be remembered, that his Lordship was speaking upon the construction of an Act of Parliament of a private nature; an Act of Parliament in the nature of a monopoly; an Act of Parliament granting an exclusive patent for an invention to the celebrated Mr. Watt. And let it be added, that his opinion as to the validity of that grant, notwithstanding all the obscurities of the Act, was ultimately sustained in the King's Bench by a definitive judgment in its favor. (See *Hornblower* v. *Boulton*, 8 T. R. 95.) A doctrine equally just and liberal has been repeatedly recognized by the Supreme Court of Massachusetts. In the case of *Richards* v. *Dagett*, (4 Mass. 534—537,) Mr. Chief Justice Parsons, in delivering the opinion of the Court, said : "It is always to be presumed that the Legislature intend the most beneficial construction of their Acts, when the design of them is not apparent." (See, also, *Inhabitants of Somerset* v. *Inhabitants of Dightown*, 12 Mass. 383 ; *Whitney* v. *Whitney*, 14 Id. 88 ; 8 Id. 523; *Holbrook* v. *Holbrook*, 1 Pick.; *Stanwood* v. *Pearce*, 7 Mass. 458.) Even in relation to mere private statutes, made for the accommodation of particular citizens, and which may affect the rights and privileges of others, Courts of Law

Hyman *v.* Read.

will give them a large construction, if it arise from necessary implication. (*Coolidge* v. *Williams*, 4 Mass. 145.)

Again, on p. 601, "An attempt has however been made to put the case of legislative grants upon the same footing as royal grants, as to their construction, upon some supposed analogy between royal grants and legislative grants under our republican forms of government. Such a claim in favor of republican prerogative is now, and no authority has been cited which supports it. Our Legislatures neither have, nor affect to have, any royal prerogatives. There is no provision in the Constitution authorizing their grants to be construed differently from the grants of private persons, in regard to the like subject matter. The policy of the common law, which gave to the crown so many exclusive privileges, and extraordinary claims, different from those of the subject, was founded, in a good measure, if not altogether, upon the divine right of kings, or, at least, upon a sense of their exalted dignity and pre-eminence over all subjects, and upon the notion that they are entitled to peculiar favor, for the protection of their kingly rights and office. Parliamentary grants never enjoyed any such privileges. They were always construed according to common sense and common reason, upon their language and their intent. What reason is there that our legislative acts should not receive a similar interpretation? Is it not at least as important in our free government that a citizen should have as much security for his rights and estate derived from the grants of the Legislature, as he would have in England? What solid ground is there to say, that the words of a grant in the mouth of a citizen, shall mean one thing, and in the mouth of the Legislature shall mean another thing? That in regard to the grant of a citizen, every word shall, in case of any question of interpretation or implication, be construed against him, and in regard to the grant of the government, every word shall be construed in its favor? That language shall be construed, not according to its natural import and implications from its own proper sense and the objects of the instrument, but shall change its meaning, as it is spoken by the whole people or by one of them? There may be very solid grounds to say, that neither grants nor charters ought to be extended beyond the fair reach of their words, and that no impli-

cations ought to be made, which are not clearly deducible from the language and the nature, and objects of the grant.

In the case of a legislative grant, there is no ground to impute surprise, imposition, or mistake, to the same extent as in a mere private grant of the crown. The words are the words of the Legislature upon solemn deliberation, and examination, and debate. Their purport is presumed to be known, and the public interests are watched and guarded by all the varieties of local, personal, and professional, jealousy; as well as by the untiring zeal of members devoted to the public service."

We think the terms of the Act of 1851 should be construed favorably to the grantee: 1st. Because it is not a grant made at the suit, or upon solicitation of the grantee. 2d. That it is a grant upon a valuable consideration, and was in the nature of a contract, the grantee assuming the trouble and cost of managing and disposing of the land, and being bound to pay to the State twenty-five per cent. upon all money received from sales of the property conveyed, which was done. 3d. That it is the deliberate public act of the Legislature.

Judgment affirmed.