Baldwin, J. delivered the opinion of the Court
—Field, C. J. and Cope, J. concurring.
Ejectment for a lot in San Francisco.
Questions of importance to the city of San Francisco are involved in the propositions made in this cause. The facts are these. This lot originally belonged to the city or pueblo of San Francisco. It was embraced in the deed made in. 1850, in pursuance of ordinances of the city, numbered forty-nine, sixty-seven and one hundred and twelve, creating the Sinking Fund, which deed the city executed to certain parties styled Commissioners of the Sinking Fund. In May, 1851, an act was passed by the Legislature entitled “An Act to Authorize the Funding of the Floating Debt of the City of San Francisco, and to Provide for the Payment of the same.” Certain persons, styled Commissioners of the Funded Debt, were appointed to receive and collect the moneys to be raised by said act. The twelfth section of the act is as follows :
“ Section 12. The Commissioners of the Sinking Fund, created by ordinance of the Common Council, are hereby required to con *20 vey to the Commissioners of the Funded Debt of the city of San Francisco, created by this act, on their application therefor, all the property, and all the rights, titles and interests in property belonging to said city: and to pay over into the hands of said Commissioners any funds, notes, securities or other assets belonging to said city which they may have received, or may hereafter receive, by virtue of article third of an act entitled “An Act to Incorporate the City of San Francisco,” approved the fourteenth of April, 1851; said Commissioners shall have the right, at such time and place as in their discretion the interest of the city may require, to expose at public sale or to lease the property to be conveyed, as provided in this section, and they shall apply the proceeds of such sale or lease to the liquidation of the floating debt of said city.”
It seems that by the tenth section, the provisions of the charter requiring Commissioners of the Sinking Fund to deliver titles, etc., to the Common Council, was repealed.
The sixth section of the Act of 1851 provides, “ that the commissioners shall, also, after discharging the trusts for which they are herein appointed, convey and restore to the city of San Francisco all the property, titles and assets belonging to the same and remaining in their possession.”
On the twenty-fourth of May, 1851, the Commissioners of the Sinking Fund executed to the Commissioners of the Funded Debt a deed of conveyance of the city property, including this lot.
The Consolidation Act passed April 19th, 1856. The Van Ness Ordinance was confirmed by the Legislature on the eleventh of March, 1858 ; the ordinance was passed on the twentieth of June, 1855. Its provisions will be found in the appendix to Hart v. Burnett (15 Cal. 627). By the fourth section of that act, the city reserves to itself all the lots which it has already set apart for sites for school houses. On the fifteenth of September, 1852, a resolution was passed by the Common Council requesting the Commissioners of the Funded Debt to set aside lots for school, hospital and engine houses; and on the seventeenth day of the same month, the Commissioners of the Funded Debt set aside certain lots—this among them—for schools, etc. November 4th, 1852, the Common Council passed another joint resolution, ratify *21 ing and confirming the action of the Fund Commissioners in assigning and setting apart lots for school houses.
On the twenty-sixth of April, 1858, an act was passed by the Legislature, entitled “An Act Granting Certain Powers to the Board of Education of the City and County of San Francisco.” The fifth section of this act is as follows :
“ Section 5. The Commissioners of the Funded Debt of the city of San Francisco, and their successors, or any three of them, shall be, and are hereby authorized, empowered and required to make, execute and deliver to the said Board of Education, trustees as aforesaid, and in trust as hereinbefore provided, good and valid deeds and conveyances of all the right, title and interest of the city, or city and county of San Francisco, and of the said Fund Commissioners, in and to all the lots heretofore set apart and granted by said commissioners, or said city, to and for the use of public schools in said city and county, whenever said Board of Education shall request the same to be made out and delivered.”
The Commissioners of the Funded Debt, on third of August, 1858, purporting to act under this statute, executed a deed to this Board of this lot.
This deed of the Commissioners passed whatever interest the city possessed in the premises—the city having, by its previous acts, assented to the reservation for schools of these school sites. The Commissioners themselves not objecting to the Act of the Legislature, but accepting and acting upon its provisions, and having large powers to be exercised for the benefit of the city, third persons, other than creditors holding the funded bonds of the Commissioners, cannot question the validity of the deed ; and even such creditors cannot question the deed, except by direct proceedings to subject the property to the purposes of the trust. They cannot interpose any objections to the deed in an action of ejectment founded upon it.
It is not deemed necessary to go, in this connection, into any inquiry as to the title of the defendants.
The deed of the city to the Commissioners of the Sinking Fund may be left out of consideration.
We have held in Heydenfeldt v. Hitchcock, following the early decision in Smith v. Morse, that this deed is void as a transfer of *22 the property of the city. (See 15 Cal. 514.) And if it were not, the execution of the deed by those commissioners to the Commissioners of the Funded Debt, under the Act of 1851, divested them of whatever title they could have acquired by the deed of the city to them. This left the property so conveyed in the Commissioners of the Funded Debt. A question has been made whether, under the peculiar terms of the Act of ,1851, all the real estate of the city, whether conveyed or not in the deed to the Commissioners of the Sinking Fund, was not designed to pass to the Commissioners of the Funded Debt. We think this is not the true construction. 1. Because it is most reasonable to construe the clause in the Act with reference to the matter for which it was enacted. 2. Because it is not reasonable to suppose that the Legislature meant to make a title in the city pass by a deed of these Commissioners who never had the title or any connection with the subject. 3. It is unreasonable to suppose that the city was to be divested “ of all her rights, titles and interests in the property of whatever kind,” including debts, chattels, money and credits of all sorts, for the benefit of the creditors for whom the deed was to be executed. 4. Because the whole scope and reason of the act show only a purpose to transfer the property, first conveyed to one set of commissioners, to another set; and the general words, used in the first member of section twelve of the act, are to be taken in connection with the matter going before, and also with the succeeding member of the same sentence, which last clause itself shows that the conveyance was to be only of property the title of which was, really or apparently, in the parties who were ordered to make the conveyance.
But as to the property which had been conveyed by the city to these Commissioners of the Sinking Fund, the Act of 1851 and the conveyance following it took effect. We have already indicated the general principles which govern such conveyances, and our opinion of the powers of the Legislature over such subjects. We understand that the execution by the city of the bonds authorized by this Funding Act, in pursuance of, and to give effect to this act, amounts to an acceptance by the corporation of the Act of the Legislature' in all its parts; and this would be sufficient to give validity to the entire act, if, by force of the legislative will alone, *23 the act, as a conveyance of the property of the city, would not be effectual. The purpose and effect of the act in this aspect of it— that is, as a conveyance or authority for a conveyance of this city property—are clearly indicated upon the face of it. The express language of it is, that it is a conveyance to the Commissioners of this property upon certain express trusts, to be used only for such trusts; and the title to return to the city upon the fulfillment of the trusts. If the debts were paid by the city, or the creditors released their claims, the property would become again the property of the city in full ownership. The legal title, as in other cases of trust-deeds for the security of debt, was in the grantee; the equity of redemption and the residuum after the satisfaction of the trust debts in the city. The city could still sell or dispose of this residuary interest, could take care of and preserve the estate—perhaps could go in possession of it, subject only to the superior right of the Commissioners, so long as the debts were unpaid.
The effect of the Van Hess Ordinance was to release to actual possessors, who were such on the first of January, 1855, the title and interest of the land so possessed by them. This interest was only, as we said before, the equity—in other words, the title subject to this trust—of such property as was conveyed in these deeds before referred to. But, according to the construction which we gave the Funding Act of 1851, (see People v. Bond, 10 Cal. 563) the act itself was a contract, (and especially would this be the case if the deed was executed according to the provisions of the statute) and having, in all its essential features, the constitutional protection of contracts. It would not, therefore, be within the power of the Legislature to withdraw this property from the creditors, who took their bonds partly on the faith of the security afforded by it for the payment of their debts, unless they assented to such withdrawal. It is true that the act gives a large discretion to the Commissioners as to mode and time of sale or lease of the land, and seems to make the exercise of this discretion dependent upon their sense of the interest of the city of San Francisco; but this is not inconsistent with the trust for the creditors—which is, indeed, in the same sentence expressly declared. Hor does the Van Hess Ordinance profess to divest the title of the Commissioners. It conveys only the right, *24 title and interest of the city of San Francisco. Those who hold under this ordinance, therefore, as to such property as was conveyed in the deeds referred to, hold in subordination to the trust— just as the city, through whom they claim, so held.
But we have seen that the city was not divested of all interest and right in this property, charged, though it was, with this general trust. It could make any disposition of this interest which it chose, within its chartered powers. It could sell the land or reserve it from sale, or lease, subject only to the superior title of these Commissioners holding it for the purpose of the trust; such disposition, while it could not bind them, would bind her; and the grantee of the city would stand in her shoes and represent her title. By the ordinance, fourth section, (Statutes of 1858, 53) “ the city reserves to itself all the lots which it now occupies or has already set apart for public squares, streets and sites for school houses, City Hall and other buildings belonging to the corporation; and also such lots and lands as may be selected and reserved for streets and other public purposes, under the provisions of the next succeeding sections.” Now, it is objected, that the acts of the city authorities purporting to reserve the property are invalid, because the title to the real estate of the corporation could only be transferred, at the time of the passage of these resolutions, by ordinance in the form of a law, as required by the charter, and not by a resolution. If this were an attempted disposition of this property, so as to pass from the city her interest in it, there would be great force in this argument. But it is not. It is a mere reservation—a withholding from sale—a declaration of unwillingness to dispose of the property. The School Department of the municipality is only a part of its government. A reservation of property for school purposes is not a disposition of it for the benefit of third persons, but a keeping of it for its own purposes. The resolution amounts only to a setting apart of property of the town for a particular town purpose, and in this respect is not different from a similar act, if such had been done, declaring that the Plaza should be reserved as a public garden, or a lot for a jail, or a house for the holding of Courts. We do not see anything in the charter of 1851 which inhibits the Common Council from making such a reservation. As the property could *25 only be sold by the city by the act and consent of the two Boards, it would seem that the express refusal to sell, in the form of a res- . olution by those Boards, reserving the property for a particular corporate purpose, would be sufficient to show, at least, that the property was still retained, claimed and held by the city. The fourth section of the Act of 1858, validating the Van Ness Ordinance, when it speaks, therefore, of property reserved and set apart for school 'sites, was intended to embrace such property as was reserved and set apart by resolution of the two Boards.
These lots, so set apart or reserved by the corporation for its own uses, did not pass, under the Van Ness Ordinance, to a person who might have been in actual possession of the lots in 1855. To suppose that the city so intended would convict its officers of the inconsistency of declaring by its two Boards that the lots should be reserved to the use of the schools, and then making, by ordinance, a gratuitous disposition of them in favor of third persons. And, besides, it would imply the folly or criminality of giving away the public property, which it was necessary should be held for an important public purpose, and to secure which the corporate authorities had all along shown themselves to be justly solicitous. Evidently the Legislature regarded these resolutions as the acts of the city, and that these acts reserved or set apart these lots for school purposes. (See Acts of 1855, 53, 342.) The acts of the city were not referred to as valid or invalid acts of themselves, but as acts indicating the purpose of the city authorities in respect to these reservations, and the Legislature meant to give effect to such purposes.
This is not inconsistent with anything we held in the recent case of Hubbard v. Sullivan. We held there that a possession by the direct permission of the city, before the passage of the Van Ness Ordinance, was such a possession as protected the possessor against any claim arising from a previous occupancy of the premises by a claimant who, at the time of such occupancy, was a mere trespasser ; and that the city, having the equity of redemption, might have entered upon the property and used it, subject only to the paramount claim of the Commissioners of the Funded Debt, holding the legal title; and that a party, entering without objection under. *26 her, could not be disturbed in that possession by a third person, any more than the city through whom he claimed. But such possession, it is obvious, would not be effectual as against the claim of the Commissioners, who, as we have seen, held the property in priority to the city for the purposes of the trust recited in the Act of 1851.
It has been seen that the Van Hess Ordinance confirmed the previous acts of the City Council, making, or purporting to make, a reservation of these school sites for the benefit of the city; and that this reservation was assented to by the Commissioners of the Funded Debt. This course of conduct, by which this claim was asserted and consistently maintained on the part of the city for so long a time, when it is taken in connection with the assent of the Commissioners that the city should hold and use this reserved property, we think sufficient to authorize it to take possession, and to maintain an action, especially against one making no further claim than that under the city.
We have reached the conclusion that the title to recover, founded upon the facts already considered, is in the plaintiff.
It remains to consider the technical matters, set up by the appellants in defense of this action.
1. It is urged that the Board of Education is not a body or legal person capable of suing ; but this point is answered by the act.
2. It is ui’ged that the suit of The City of San Francisco v. E. Heydenfeldt, which involved a portion of this lot, is a bar or defense to this proceeding. Judgment was recovered below for the icity in this suit, but on appeal here, judgment was reversed, and ■cause remanded. Besides that the facts of that case are not the -same as those here—the plaintiffs there not having the title here .set up—there is no final judgment; the opinion of the Supreme 'Court having no further effect than to affirm certain principles of ¡law, which, indeed, might be conclusive in their application to the •same facts and between the same parties, as to that suit, but which ¡have no effect immediately upon the property as a judgment affirming or disaffirming title upon substantially different facts or in a ■different proceeding. The case, so far as appears, has never been ■tried since the decision here, and even if the parties were the same *27 as those to this record, and even if all the property was the same, this Court or the Court below would not be bound to give more than the weight of authority to this decision. Indeed, the very ground of that decision may have been—we presume was—that the title was in the Fund Commissioners, and therefore, the plaintiff there could not recover. Even if a final judgment affirmed the asserted principle as law, and the Court or jury found the facts in connection with the principle, this would be no answer to a subsequent suit by a plaintiff who stood on the title of the city and the Fund Commissioners.
3. Nor does the deed from Boring to the city create any impediment to the plaintiff’s recovery. This was merely a quit claim, releasing the grantor’s title to the city ; but it does not show or tend to show that the city had no other title—much less does it impair the effect of the previous acts of the city in favor of the Board, or the acts of the Fund Commissioners.
It may be remarked, that the Act of 185Í gives considerable discretion to the Commissioners in the execution of this trust, and directs that discretion to be exercised for the benefit of the city. It is scarcely to be supposed that an arbitrary exercise of authority, by such partial discriminations as would throw the whole burden upon particular portions of this property thus affected, would, even if legal, be done. Whether, in the exercise of this power, the public interest involved in the freeing of large masses of city property from such burdens, by some equitable apportionment of the common charge would not be for the public interest, is a matter which addresses itself to the consideration of those interested, and which we are not called upon to decide.
We have thought it best to meet these questions fully, as they arise upon this record and concern the public interest.
Judgment affirmed.