[No. 5,644.]

Le ROY et al. *v.* DUNKERLY et al.

Tide Lands — Military Reservation.—From the date of the treaty of 1848, the tide lands in California—unless they had been reserved by Mexico for military purposes, or otherwise disposed of by her—were held by the United States in trust for the future State; and upon the admission of California the legal title thereto vested in the State.

San Francisco — Beach and Water Lots. — The legal title of the City of San Francisco, in the beach and water lots granted to her for the term of ninety-nine years, by the Act of March 25th, 1851, vested—by virtue of the deed of the Commissioners of the Sinking Fund, and the Act of May 1st, 1851, and by the acceptance by the city of the terms of that Act, and its consent to the transfer—in the Commissioners of the Funded Debt.

Id.—Execution— Municipal Corporation—Equitable Estate.—In this State, all beneficial estates—whether legal or equitable—are liable to be taken on execution; and therefore, a purchase under an execution sale of the interest of the city in the beach and water lots, and the Sheriff's deed made in pursuance thereof, operated as an assignment of the equitable estate remaining in the city after the legal title vested in the Commissioners of the Funded Debt.

Id.—Trust—Deed of Trustee.—By the Act of April 2nd, 1866, the Commissioners of the Funded Debt were authorized, in certain cases—with the consent of the Board of Supervisors—to make conveyances of the trust lands; and they executed a deed to the plaintiffs, but whether with the consent of the Supervisors, the record did not show. *Held*, 1st, that even if the deed was unauthorized by the trusts as originally defined in the Act of May 1st, 1851, or as modified by that of April 2nd, 1866, it operated to transfer to the grantees the *legal* estate, and the defendants—being mere intruders—could not assert the breach of trust as a defense to an action at law to recover the land; and 2nd, that the consent of the city was unnecessary, as the plaintiff had, under the Sheriff's deed, succeeded to all the rights of the city, including the right to consent to the conveyance.

Appeal from an order granting a new trial, in the Fifteenth District Court, City and County of San Francisco. Dwinelle, J.

The facts are stated in the opinion.

*Edward S. Taylor*, and *B. S. Brooks*, for Appellants.

1st. The deed to the Commissioners of the Funded Debt, signed by the Commissioners of the Sinking Fund and sealed with their private seals, conveyed nothing. The city had no power to convey. They had no authority to convey for the city. Their private seals would have been ineffectual if they had.

2nd. The obligation of the city could not be enforced by a sale upon execution of the municipal property; there was no authority for the city to sell it. It was part of the land claimed by the State by virtue of her sovereignty. The transfer to the State was a delegation of sovereignty, incumbered with obligations touching commerce and navigation, which could only be discharged by a body possessing municipal and governmental functions, and the land was incapable of alienation. It was subject to an easement, in the public, of navigation, fishery, etc.   *   *·  *

5th. Point San José was a Mexican and Spanish fortress. As such, the land within eight hundred yards was reserved from private ownership. (*Mitchell* v. *U. S.* 9 Peters, 711, 761; S. C. 15 Id. 52, 91.)   *   *   *

The transcript states that the Commissioners, "on the 25th day of July, 1869, executed and delivered an instrument, in form a deed, purporting to convey the demanded premises to the plaintiff." It is not recited, and it does not appear, that the Board of Supervisors *consented to the conveyance.* Without this consent the Commissioners *had no power to act.* The presumption in favor of the action of an official in conveying land attaches only *after it has been shown that the official had the power to act.* It is well settled that an official will be presumed to act regularly, rather than irregularly, *in the execution of a power given him;* but to hold that he has the power, simply because he exercises it, is to prove by the act itself the *power to act.* (*Wilcoxson* v. *Miller*, 49 Cal. 194.)

*John A. Stanley*, and *George R. B. Hayes*, for Respondents.

The interest of the city in the lands in controversy became vested in the plaintiffs by virtue of the execution sale. (*Smith*

v. *Morse*, 2 Cal. 524; *Holladay* v. *Frisbie*, 15 Id. 630 ; *Wheeler* v. *Miller*, 16 Id. 124.)

As to the appellants' first point, it is not material to inquire what was the effect of the deed therein referred to, considered by itself. It — in connection with the Act of May 1st, 1851, constituting the Board of Funded Debt Commissioners—vested whatever title the city had in that Board. (*Board of Education* v. *Fowler*, 19 Cal. 11.) The appellants' second point is answered by the authorities we have cited.

It is presumed that the Commissioners of the Funded Debt acted regularly in making the deed of June 25th, 1869, to the plaintiff. (*Phil. & Trenton R. R. Co.* v. *Stimpson*, 14 Peters, U. S. 458; Code Civ. Proc. § 1963; *Ross & Morrison* v. *Reed*, 1 Wheat. 436; *U. S.* v. *Arredondo*, 6 Peters, 727 ; *Strother* v. *Lucas*, 12 Id. 438; *Minter* v. *Crommelin*, 18 How. 89; *Jackson* v. *Cole*, 4 Cow. 587 ; *Jackson* v. *Belknap*, 12 Johns. 97 ; *Russell* v. *Beebe*, Hemp. C. C. 705 ; *Wallace* v. *Maxwell*, 1 J. J. Marsh. 450; 1 C. & H. notes to Phill. on Ev. 459; *U. S.* v. *Dandridge*, 12 Wheat. 70 ; Broom's Leg. Max. 3rd ed. 729.)

Department No. 1, McKINSTRY, J.:

The action is ejectment to recover possession of a block of land situated within the limits of the tract granted by the State to the City of San Francisco for the term of ninety-nine years, by the Act of March 26th, 1851. (Laws 1851, p. 307.)

It is claimed by appellant that the lands in controversy never became the property of the State of California, from whom plaintiffs pretend to deraign title, but passed from the Mexican Government to that of the United States as part of a military reservation. The lands are covered by the waters of the Bay of San Francisco, and lie beyond the line of ordinary high tide. The bill of exceptions contains the following: " It was admitted by the plaintiffs that Point San José, or Black Point, so called —the promontory—was occupied as a military post by the Mexican Government, and was so occupied at the time of the transfer of the fort to the Americans, and has continued to be so occupied down to the present time." It was shown at the trial

that the demanded premises were within a circle of a radius of eight hundred yards, accepting the extremity of the promontory as the central point.   On the last day of the year 1851, the then President of the United States issued his proclamation, in part, as follows: " The reservation, including Fort Point, Point San José, and the Presidio, at the entrance of the harbor of San Francisco, made by order dated November 6th, 1850, is hereby modified and reduced so as to embrace only the two following tracts of land, viz., the *Promontory* of San José, within boundaries not less than eight hundred yards from its northern extremity," etc.   It is beyond question that the lands in dispute herein are not within the limits named in the proclamation, since, by its terms, those limits include only dry land.   The order of November, 1850, is not in the transcript; but there is no suggestion that the demanded premises are included within any boundaries defined in that order.   From the date of the treaty of 1848, the portion of the *tide lands* in controversy was held by the United States in trust for the future State; and, on the admission of California, the legal title to said lands became vested in the State, *unless* it had been shown that they had been reserved by Mexico as part of a tract set aside for military purposes, and had passed to the United States — under our system especially charged with the defense of the harbor. (*Pollard's Lessee* v. *Hagan*, 3 How. U. S. 220; *Webber* v. *Harbor Commissioners*, 18 Wall. 65; *Tripp* v. *Spring*, Pacific Coast L. J. vol. 2, p. 30.)

There is no evidence that any portion of the tide lands thereabout were ever expressly reserved by the Mexican Government, but it is said that inasmuch as it was proved that a fort was established on the *promontory*, a space of land and water, such as might have been swept by its guns—arbitrarily fixed at eight hundred yards, with the extremity of the point as a center—was reserved from private ownership.   Doubtless it is a usage of war to remove or prohibit the erection of any private building which may interfere with the command of the earth's surface for such distance around a military fortification as the commandant of the post or his engineers may deem requisite.   In such case the military necessity is, for the time, the

supreme law. But this, of itself, would not prevent the acquisition from the Government of property in the lands within range of the guns, which, like all other property held in private ownership, might be subject in certain exigencies to such injury as is incidental to the protection of the country against a public enemy.

We fail to find that the case of *Colin Mitchell* v. *The United States*, 15 Peters, 52, conflicts with the views above expressed. That case merely interprets and renders more definite the decree directed by the Supreme Court of the United States in *Mitchell* v. *The United States*, reported in 9 Peters, page 711. The causes had reference to the private land claim of Mitchell and others, which was based upon grants of the Creek and Seminole Indians, ratified by the authorities of Spain before the cession of Florida to the United States.

The Court, (9 Peters) in confirming the plaintiff's title, *excepted* from one of the tracts the fortress of St. Marks "and the territory immediately adjacent and appurtenant thereto." Reference was made to a provision of the Act of Congress under which the adjudication was made, which contained a clause applicable to any grant—"which was protected and secured by the treaty, and which *might have been perfected* into a complete title, under and in conformity to the laws, *usages, and customs* of the government under which the same originated." This was held to be an express recognition of any known and established usage or custom in the Spanish provinces in relation to grants of land and the title thereto, which should bring them within a well-established rule of law. The cause was remanded, with directions that the *lands ceded by the Indian proprietors* to the crown of Spain for the fortress be ascertained, and such lands be excepted from the tracts confirmed to the plaintiffs; further, if the boundaries of such cession could not be ascertained, then that the lands adjacent to the fort, " which had been considered and held by the Spanish Government or the commandant of the post as annexed to the fortress," be still considered as annexed to it, and held with it for the use of the United States; and, if no evidence could be obtained to designate the extent of the adjacent lands which were considered as

annexed to St. Marks as aforesaid, then so much land should be comprehended as according to the military usage "was generally attached to forts in Florida or the adjacent colonies." After filing the mandate of the Supreme Court of the United States in the Superior (Territorial) Court of Middle Florida, the plaintiffs filed a bill claiming from that Court a confirmation of the lands excepted up to the walls of the fort of St. Marks, and (by amendment) claiming the land covered by the fort itself. The Superior Court, however, (after finding that there was no sufficient evidence designating the extent of the territory ceded by the Indians, or the adjacent lands considered by the Spanish Government or commandant of the post annexed to the fort), declared that there *was evidence* on which to determine the extent of lands adjacent to forts in Florida which was usually attached to such forts, and that the extent of such reservations was determined "by a radius of 1,500 Castilian *varas* from the salient angles of the covered way all around the works," etc. The land within such a circle around the Fort St. Marks was excepted from the private claim confirmed. (15 Peters, 83.)

The case of the plaintiffs before us does not depend upon any grant made to them during the Spanish or Mexican sway. We are not inquiring whether the plaintiffs have derived from Mexico an imperfect right, which might, or might not, have become a complete title in accordance with the usages or customs of that country. The question here is whether, from the treaty up to the admission of California into the Union, the United States held the legal title to these particular lands (in common with all the other *tide lands*) in trust for the State government which should be organized; or whether the United States Government held them in full ownership, freed of any trust in favor of the future State, and for its own exclusive use and benefit as a military reservation, and since continues to hold them?

There is no evidence in the record that the demanded premises were included by any direct or express act within the boundaries of a military reservation, nor is there any evidence that a custom or usage ever existed in Mexico or California by which lands situated like the demanded premises were withheld

from private grant, or reserved by the Government as annexed to a military post or appurtenant thereto. In the absence of such evidence (whatever might otherwise be said) it must be held that the lands in controversy attached to the State of California in full ownership on her admission into the Union " upon an equal footing with the thirteen original States."

The legal title of the city in the term mentioned in the Act of March 26th, 1851, was conveyed to or vested in the Commissioners of the Funded Debt, (subject to certain trusts in favor of the city and its creditors) by virtue of the deed of the Commissioners of the Sinking Fund, the Act of May 1st 1851, " to authorize the funding of the floating debt," etc., the acceptance by the city of the terms and conditions of that act, and the city's *consent* to the transfer to the Commissioners of the Funded Debt. (*Board of Education* v. *Fowler*, 19 Cal. 22.)

In respect to the law of May 1st, 1851, and the proceedings under it, the Supreme Court, in the case last cited, has said: " But as to the property which has been conveyed by the city to these Commissioners of the Sinking Fund, the Act of 1851 and the conveyance following it took effect.   *   *   *   We understand that the execution by the city of the bonds authorized by this Funding Act, in pursuance of and to give effect to this act, amounts to an acceptance by the corporation of the act of the Legislature in all its parts; and this would be sufficient to give validity to the entire act, if, by force of the legislative will alone, the act, as a conveyance of the property of the city, would not be effectual. The purpose and effect of the act in this aspect of it—that is, as a conveyance or authority for a conveyance of this city property—are clearly indicated upon the face of it. The express language of it is, that it is a conveyance to the Commissioners of this property upon express trusts, to be used only for such trusts, and the title to be returned to the city upon the fulfillment of the trusts. If the debts were paid by the city, or the creditors released their claims, the property would become again the property of the city in full ownership. The *legal title*, as in other cases of trust deeds for the security of debt, was in the grantee; the equity of redemption and residuum after the satisfaction of the trust

debts, in the city.   *The city could still sell or dispose of this residuary interest, could take care of and preserve the estate— perhaps could go into possession of it,* subject only to the superior right of the Commissioners, so long as the debts were unpaid."

On the 15th day of September, 1851, in the Superior Court of San Francisco, one *Carr* recovered a money judgment against the city, which on the same day was duly entered, docketed, and recorded.   At the sale under execution duly issued upon such judgment, the plaintiffs purchased the premises herein demanded, and received the Sheriff's certificate and deed of the same.

As we have seen, before the date of that judgment, the *legal title* had been vested in the Commissioners of the Funded Debt.

There can be no manner of doubt that prior to the passage of the Act of May 1st, 1851—if not prior to the assent of the city to the property being placed in the hands of the Commissioners of the Funded Debt—the interest of the city in the Beach and Water Lots for the ninety-nine years was absolute—qualified by no conditions.   It was subject to levy and sale under execution; and had the levy under the execution through which plaintiffs deraign been made prior to May 1st, 1851, plaintiffs would have acquired, by virtue of the Sheriff's deed, the legal title to the ninety-nine years' term.   (*Holladay* v. *Frisbie,* 15 Cal. 635; *Wheeler* v. *Miller,* 16 Id. 124.)

The purchase by the plaintiffs at the execution sale, and the Sheriff's deed to them, operated an assignment of the equitable estate remaining in the city after the legal title vested in the Commissioners of the Funded Debt.   Section 217 of the Practice Act of 1851 read: "All property, real and personal, of the judgment debtor, not exempt by law, shall be liable to execution."   Nowhere in that act are equitable estates or interests mentioned *eo nomine*; all property *remaining in a grantor* of the legal estate was liable to seizure under execution, as included in the general term "property."   The city, as we have seen, retained a right in the residuum after payment of its debts, etc.; an interest which amounted indeed to the exclusive use and enjoyment, subject only to the superior right of the Commissioners to sell and convey any portions of the lands while

the debts remain unpaid. (*Board of Education* v. *Fowler, supra.*) In this State all beneficial estates are liable to be taken in execution, irrespective of the question whether they are legal or equitable. (*Kennedy* v. *Nunan,* 53 Cal. 331; Freeman on Executions, § 188.)

The plaintiffs having thus been substituted for the city with respect to its rights in the property, the transcript further shows that, " on the 25th day of July, 1869, the Commissioners of the Funded Debt executed and delivered to plaintiffs an instrument in form of a deed, purporting to convey the demanded premises."

On the 2nd day of July, 1866, the Legislature had passed an act which, after reciting that by the Act of May 1st, 1851, certain real estate of the city had been conveyed by the Commissioners of the Sinking Fund to the Commissioners of the Funded Debt, and that it was alleged that certain lots of such real estate had not been leased, conveyed, or otherwise disposed of by the Commissioners last named, but were held adversely, authorized the Commissioners of the Funded Debt, " by and with the consent of the Board of Supervisors," to sell at public or private sale, and convey any lot or lots described in the conveyance from one of the said Boards of Commissioners to the other, to any person or persons claiming the same, or claiming title thereto by purchase for a valuable consideration, or by devise or descent; provided no such sale should be made for less than fifteen per cent. of the assessed value of the property so sold or conveyed.

It may be assumed for the purposes of this case that the legal title to the *tide lands* might have been vested in the Commissioners of the Funded Debt in trust for the payment of the city's debts, without the city's consent. (*Grogan* v. *San Francisco,* 18 Cal. 591.) The legislation of the State, however, has always left the control of these lands in the city. It will have been observed that in *Board of Education* v. *Fowler,* the Court laid stress upon the *acceptance* by the city of the Act of 1851, with all its terms and conditions. We need not inquire whether it would now be held that the acceptance of the act by the city—or its consent to the transfer of the legal title to the

Commissioners of the Funded Debt—could be shown otherwise than by resolution of the Board of Supervisors. Such consent was contemplated—or at least was possible—and was given under the Act of 1851, as that act was construed in *Board of Education* v. *Fowler*. There can be no doubt that the Legislature could continue in the city the power to contract with respect to the property, and make the disposition of it depend upon the assent or dissent of the municipality.

The Act of April 2nd, 1866, in terms, made the *consent* of the city necessary to a sale by the Commissioners. The Board of Supervisors constitute the local legislature, and, as the city and county or its agents, in the absence of specific provisions or limitations to the contrary, have the management of the property of the city and county—the successor of the City of San Francisco. Where the property is held as private property, or where, as in the present case, the disposition of it depends upon the *consent* of the city and county, such consent must be expressed by the Supervisors. There can be no reasonable doubt that the *consent* required by the Act of April 2nd, 1866, is the consent of the municipality, which, so long as the city and county retained an interest in the property, could be given only through the Board of Supervisors.

That the consent of the city was required to the new trusts impressed upon the legal title of the Commissioners of the Funded Debt, again indicates that the Legislature had intended to leave to the local government the control of the property—except so far as the previous Act of May 1st, 1851, had deprived it of such control.

It was urged by appellants, that by the Act of April 2nd, 1866, the Commissioners of the Funded Debt had no *power* to make the deed of July 25th, 1869, without the consent of the Board of Supervisors first obtained; and that there is neither evidence *aliunde* of such consent, nor—as must be assumed, since the deed is not set out at length in the bill of exceptions—any recital to that effect in the conveyance itself. But—as a consequence of what has been said above, and as the rights of the parties affected were fixed and established by the Act of May 1st, 1851, and the consent of the city thereto—the legal

title was in the Commissioners of the Funded Debt as trustees of an express trust, and the city was *cestui que trust;* it would seem, therefore, that the rights of each should be tested by reference to the principles which would govern in case of the creation of similar trusts by private contract. Tested by that standard, even if the deed from the Commissioners to the plaintiffs of July 25th, 1869, was unauthorized by the trusts as originally defined in the Act of May 1st, 1851, or as modified by that of April 2nd, 1866, it operated to transfer to the grantees the *legal estate,* and in ejectment the legal title must prevail. (Hill on Trustees, pp. 175, 188.) The city, or the assignees of its equity, might continue to treat the Commissioners as trustees, or might follow the legal title into the hands of the grantee of the Commissioners; but the defendants—mere intruders—could not assert the breach of trust as a defense to the action at law for the recovery of the possession. (Perry on Trusts, § 274.)

It is unnecessary to uphold the conclusion last reached, by asserting that in consequence of *any inherent quality* in the municipality, as such, it controls the disposition of property like that in controversy, so that such property may not be disposed of by the paramount political authority without the consent of the municipality. It has been enough to ascertain that the power of assent or dissent to its disposition has been placed or left by the Legislature in the city and city and county.

But even if it could be held, under different circumstances, that defendants might object to the failure to prove the consent of the city to the conveyance of July 25th, 1869, the plaintiffs here are, as well the assignees of the city, as grantees of the Commissioners. The right to consent to the conveyance, as every other right of the city in the premises, had passed to the plaintiffs, by virtue of the execution sale and Sheriff's deed, and no stronger evidence of plaintiffs' consent to the conveyance could be required than that they took it and claim under it.

The record does not disclose a reconveyance by the Commissioners of the Funded Debt to the city and county, or that the debts of the city have all been paid by the Commissioners, nor does the assent of the creditors of the city appear to be a divergence from the original purpose of the trust as defined by the

Act of 1851. A creditor not yet paid may assert a right to have the land in controversy (if there be not sufficient remaining in the Commissioners) subjected to sale, and the proceeds applied to the satisfaction of his claim. His claim, however, is but an equity, which may bind the legal title of the plaintiffs, but which cannot affect the right to the possession until asserted. The defendants are not creditors, or in any way connected with the creditors of the city, for whose benefit the disposition of the lands was placed in the hands of the Commissioners.

The evidence required of the Court below to grant a new trial. Order affirmed.

Ross, J., and McKee, J., concurred.