38 N.J. Super. 274 (1955)
118 A.2d 724
GEORGE REYNOLDS, PETITIONER-APPELLEE,
v.
GENERAL MOTORS CORPORATION, HYATT BEARINGS DIVISION, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Hudson County Court, Law Division.
Decided November 29, 1955.
*275 Mr. David B. Geltzeiler, attorney for petitioner-appellee (Mr. Herman M. Wilson, appearing).
*276 Messrs. Carpenter, Gilmour & Dwyer, attorneys for respondent-appellant (Mr. Carl S. Kuebler, appearing).
McGEEHAN, J.S.C.
In the Division of Workmen's Compensation, petitioner George Reynolds was awarded workmen's compensation, and the respondent employer appeals.
The petitioner, now 42 years of age, was employed by the respondent from August 1942, until September 19, 1951. Prior thereto he had worked regularly as a grocery clerk, stock clerk and theater usher, and then in the shipping department of the United Features Syndicate.
The petitioner worked for the respondent as an internal grinder intermittently from the start to November 1946, then continuously as such to July 23, 1951, after which he was employed as a setup man in the same department, but still working at the grinding machines, until he left for reasons of illness on September 19, 1951. His work as a grinder consisted in doing what is known as wet grinding, in that a coolant ran over the work; the steel bearings, otherwise called races, were placed in the grinding machine and ground down by a rapidly propelled grinding wheel. There was a spray from the coolant solution which got on the clothes and body of the grinders and later would turn to dry dust or grit. The wheels used for grinding wore out or ground down; between 6 and 12 grinding stones would be used up daily and have to be changed. The grinding stone breaks away to a certain degree and the grinder must dress it off from time to time with a diamond needle, and this operation caused a cloud of dust. The face of the grinder is held within 16 or 17 inches of the grinding wheel; the dust from the grinding wheel gets on the grinder's clothes, in his hair and in his nose and throat. The petitioner had to blow his nose frequently and when he did so, a colored substance, mostly black, sometimes gray, came from his nose; his voice became raspy and he expectorated frequently.
The room in which he worked was well ventilated, with a change of air every 7 minutes and 52 seconds, without the *277 use of windows. There were large windows in three sides of the room, approximately 20 in all, which were opened in the summer, and during the balance of the year were opened to the extent that weather conditions permitted. Dust count tests made as late as April 1951 disclosed that the dust concentrations were below the permissible limits for that type of dust as specified by the New Jersey Department of Health. The dust samples collected in the aisle between the four grinding machines such as petitioner worked with consisted of iron particles and artificial abrasive particles which are classed as inert dust. Testings showed two million particles of this dust per cubic foot of air, while the New Jersey Department of Health, in 1947, specified a permissible limit of fifty million particles per cubic foot of air for inert or nuisance dust. There was air-borne mist in the room from the coolant.
Petitioner drank occasionally but not excessively and smoked one pack of cigarettes a day. Prior to September 1951 he had not suffered any serious illness or exposure to tuberculosis.
Upon employment, X-ray examination of his chest was made which showed an increase in the hilar shadows, with calcification in and around the hilar areas. Both Dr. Lieb, who testified for the petitioner, and Dr. Applebaum, who testified for the respondent, agreed that the presence of calcification in the right hilar zone in these first X-rays taken of petitioner on August 24, 1942, was evidence of a pre-existing latent tuberculosis that was quiescent, and further that tuberculosis can be reactivated without contact. X-rays taken September 4, 1945, and September 11, 1947, showed the same conditions as shown on the X-rays of August 24, 1942.
On September 6, 1951 the petitioner had chills and fever at work. He saw the foreman and the plant nurse and returned home, where he was treated with penicillin by his family physician. He stayed away from work until September 13, when he returned and was examined by the plant physician, Dr. Paul. X-rays were taken at the plant, but were not immediately examined. Later examination of these *278 X-rays by Dr. Paul, after petitioner had left his employment on September 19, disclosed "advanced pulmonary tuberculosis, right upper lung field." The plant physician, Dr. Paul, after the examination of September 13, returned the petitioner to work. He felt weak, but continued to work until September 19, when he consulted his own physician, who sent him to St. Vincent's Hospital. The St. Vincent's Hospital diagnosis, made September 20, was pulmonary tuberculosis in the right upper lobe, with numerous cavity formations in the region of the right upper lobe. He was transferred to Bellevue Hospital, where he was admitted September 21, 1951. Thereafter, the disease spread to the right lower lobe and to the left side following streptomycin therapy. A first stage thoracoplasty was done on December 9, 1952, and a second stage on December 29, 1952; in all, portions of seven ribs on the right side were removed. He was discharged from Bellevue Hospital on March 30, 1953, with a diagnosis of pulmonary tuberculosis, 111B associated disease thoracoplasty. Thereafter, he was admitted to the Herman M. Biggs Memorial Hospital in Ithaca, New York, where he was confined until October 14, 1953, when he was discharged at his own request. Since then he has been under observation in the New York City Health Department and Bellevue Hospital for periodic examinations.
Petitioner first began to feel ill in April 1951. He was tired, had shortness of breath, slept poorly, had night sweats, and there was an increase in coughing, both morning and night. These conditions continued until September 6, 1951. Between April and September 1951 he lost 10 or 11 pounds.
Another grinder in the same department, one Edward White, was employed by the respondent on August 30, 1937. White's first X-ray was taken December 12, 1940, and was read as negative with no shadows at all. The first evidence of any involvement of the lungs of White was in an X-ray taken on October 30, 1951, more than a month after petitioner had left his employment, which showed that White had tuberculosis. White left his employment at that time and returned to work February 16, 1953, doing light work. *279 Another grinder in the same department, one Joe Isyanovage, was employed by respondent on May 14, 1937; he was first X-rayed September 30, 1941, which X-ray was essentially negative. From the time of his employment, 12 X-rays of Isyanovage were taken from time to time. The X-ray taken April 18, 1952 was different from the five previous ones, in that the shadow in the right upper lung field, which had shown on the five previous X-rays as insignificant, on this X-ray was shown as increased. Three weeks later another X-ray was taken and read as showing a probable active pulmonary tuberculosis. Isyanovage went to a sanitarium for four months; no bacteria were found, and eight months later he returned to work for the respondent at the same job he had been doing before. At no time did any X-ray of the petitioner or of his co-workers White or Isyanovage ever show any fibrosis of the lung.
Dr. Lieb, a witness for the petitioner, testified that it was his opinion "that in this case the exposure to this excessive amount of dust eventually caused a severe bronchitis, and irritation of the lung tissues, and increased coughing. Now, this persisted and increased in intensity and he had the breaking down and spreading of a pre-existent latent tuberculous focus."
The deputy director concluded that the tuberculosis from which the petitioner suffered "was not due to the exposure to dust inhalation but * * * that the petitioner sustained an infectious tuberculosis as a result of his employment with the respondent during the nine years in which he was so engaged, and that more specifically by reason of his association with his co-workers, Mr. White and Mr. Isyanovage, I am satisfied that from a consideration of the testimony, particularly that of Dr. Willner, that it was Mr. White, rather than the petitioner, who had first succumbed to the ravages of this disease; and that through that agency both Mr. Isyanovage and the petitioner subsequently succumbed. This conclusion is obviously in contradiction with the testimony of the petitioner's Dr. Lieb, but it is my right to *280 make an independent finding predicated on the testimony adduced."
As the petitioner's claim rests on either the cumulative effect of inhaling dust in the course of his employment over a long period of time or the contracting of the disease from a co-worker suffering from such disease, there can be no award for injury "by accident" under our statute. Stepnowski v. Specific Pharmaceuticals, Inc., 18 N.J. Super. 495 (App. Div. 1952), and cases cited therein. The question now is whether he suffered a "compensable occupational disease" under R.S. 34:15-31, as amended by L. 1949, c. 29, § 2, which provides:
"For the purposes of this article, the phrase `compensable occupational disease' shall include all diseases arising out of and in the course of employment, which are due to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or employment, or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment."
The very broad language introduced into this act by the 1949 amendment seems to meet generally the suggestion made by Dean Larson in order to overcome the paradox created by the acts which make compensable the expectable diseases caused by the employment, but leave noncompensable the fortuitous and unlooked for diseases equally caused by the employment. Dean Larson suggested that the simplest legislative coverage to avoid the paradox is to define accidental injury "as including any disease arising out of and in the course of employment, thereby putting accidental and occupational diseases on the same footing." 1 Larson, Workmen's Compensation Law, 592, § 40.60 (1952).
In the consideration of diseases in other states and in the federal courts, the difference in the language of the particular statutes must be kept in mind. When cases such as Harman v. Republic Aviation Corp., 298 N.Y. 285, 82 N.E.2d 785 (Ct. App. 1948) and Buckley v. Gallagher Bros. Sand & Gravel Corp., 300 N.Y. 447, 92 N.E.2d 38 (Ct. App. 1950), in which compensation was denied, and cases such as *281 Grain Handling Co. v. Sweeney, 102 F.2d 464 (2d Cir. 1939), certiorari denied 308 U.S. 570, 60 S.Ct. 83, 84 L.Ed. 478 (1939); Board of National Missions of Presbyterian Church in United States of America v. Alaska Industrial Bd., 116 F. Supp. 625 (D.C. Alaska, 1953) and Pacific Employers Ins. Co. v. Industrial Accident Comm., 19 Cal.2d 622, 122 P.2d 570, 141 A.L.R. 798 (Cal. Sup. Ct. 1942), rehearing denied (1942), in which compensation was granted, are examined, they are found to be of little aid because of the difference in the statutory language involved, or because a greater coverage is given to disease under the accidental feature of the statute. It is interesting to note in passing that in Griffin v. Griffin & Webster, Inc., 283 App. Div. 145, 126 N.Y.S.2d 672 (App. Div. 1953), the court discussed the Harman case and other earlier New York cases in which compensation for disease was denied, and pointed out that the trend of the later New York case law is to broaden the scope of coverage for disease.
Under the second part of the definition of occupational disease in our act, a tuberculosis contracted by petitioner is made compensable on a satisfactory showing that such tuberculosis was contracted from a particular fellow employee or particular fellow employees suffering from active pulmonary tuberculosis. In such a case the petitioner's tuberculosis is a disease which is due to the exposure of the petitioner to a cause thereof, namely, the source of the contagion, which arose out of and in the course of petitioner's employment. However, proof that this petitioner's tuberculosis was contracted from a fellow worker having this disease is lacking here. There is nothing in the evidence to support the finding by the deputy director that the more probable hypothesis is that fellow employee White had an active tuberculosis and that petitioner's tuberculosis came from infection from White. The facts that petitioner's tuberculosis was known to be active as early as September 13, 1951, as shown by the X-rays taken by Dr. Paul, and had caused stoppage of work by petitioner on September 19, 1951; that fellow employee White continued to work until *282 October 30, 1951, when an X-ray taken by Dr. Paul disclosed that he had tuberculosis, while prior X-rays of White were negative; that White left his employment October 30, 1951, but returned to work February 16, 1953, and continues doing light work; and that petitioner's tuberculosis was so much more incapacitating than White's, all tend to make the hypothesis that White had active pulmonary tuberculosis before petitioner's tuberculosis became active in September 1951, and that through contact with White petitioner became infected, no more than pure speculation. The doctors who testified on this phase of the case agreed that it is a "highly speculative thing," under the circumstances, to say that one of the two named co-workers came down with active tuberculosis and that Reynolds contracted it from such co-worker.
However, the award of compensation is justified on another ground. Dr. Lieb, petitioner's witness, and Dr. Applebaum, respondent's witness, agreed that the X-ray of Reynolds taken at the time of his employment on August 24, 1942, showed that he had a pre-existing latent tuberculosis which was quiescent, and also agreed that latent or dormant tuberculosis can be reactivated without contact with the tubercle bacillus. Reynolds did inhale dust while working, which was sufficient in nature and degree to bring on, in his physical condition, coughing and sneezing which continued for a long period of time. The effect of this inhalation on Reynolds, according to Dr. Lieb, was to bring on an irritation of the lung tissues, which persisted and increased in intensity, with the result that Reynolds had a breaking down and spreading of his pre-existing latent tuberculosis. This meets the test of the second provision of R.S. 34:15-31, as amended in 1949. The fact that the dust in the place of employment was not in nature or content such as would cause a fibrosis of the lungs in a person of good health or cause a tuberculosis in such a person, is not a bar to recovery.
As was said in Bondar v. Simmons Co., 23 N.J. Super. 109, 116 (App. Div. 1952), affirmed o.b. 12 N.J. 361 (1953):
*283 "The word `employment,' as used in the statute, is not designed to restrict recovery to employments which are innately dangerous, but is intended to include employments from which a disease arises by reason of the susceptibility of the particular claimant to the deleterious effects of his occupation."
In Giambattista v. Thomas A. Edison, Inc., 32 N.J. Super. 103, 111 (App. Div. 1954), the court in construing R.S. 34:15-30, as amended in 1949, said:
"The 1949 amendment is deliberately comprehensive in language and scope. It even covers a disease the risk of which is not generally known in the particular employment or where the contraction of it is the result of the individual susceptibility or allergy of the particular employee, so long as it is due to exposure to a cause thereof arising out of and in the course of the employment. * * * In view of the definition in our statute, the proof of a causal connection between working conditions and the harm should be the focal point of the inquiry."
When an employee brings to his work a proneness or susceptibility to disease quite different from the ordinarily healthy man, and the work adds a cause which brings on such a disease, the resulting disease is compensable under our act as a disease due to the exposure of the employee "to a cause thereof arising out of and in the course of his employment." Compare Ralph's Case, 331 Mass. 86, 117 N.E.2d 142 (Mass. Sup. Jud. Ct. 1954); Kulig's Case, 331 Mass. 524, 120 N.E.2d 757 (Mass. Sup. Jud. Ct. 1954).
In discussing the definition of occupational disease in the 1949 amendment to our statute, the writer in 8 Rutgers L. Rev. 97 (1953) said at p. 105:
"This definition would seem to include all physical harms which are causally related to the employment, whether they arose from some specific incident or were the result of a gradual wear and tear on the body of the worker because of some exposure in the course of his employment."
The award of compensation is affirmed with costs.