[S.F. No. 23686. Feb. 22, 1980.]

CITY OF BERKELEY et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY,
Respondent;
SANTA FE LAND IMPROVEMENT COMPANY et al.,
Real Parties in Interest.

518

**COUNSEL**

Evelle J. Younger, Attorney General, N. Gregory Taylor, Assistant Attorney General, Dennis M. Eagan, Deputy Attorney General, Michael Lawson, City Attorney, Sullivan, Jones & Archer, Richard J. Archer, Kristina M. Hanson and Lee J. Sclar for Petitioners.

Hancock, Rothert & Bunshoft, Barry L. Bunshoft, Donald Alford Weadon, Jr., and John D. Hoffman as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Edgar B. Washburn, Frederick M. Wooster, Washburn, Kemp & Wagenseil, Paul O. Lamphere and Cox, Cummins & Lamphere for Real Parties in Interest.

Pillsbury, Madison & Sutro, Nobel K. Gregory and Allan N. Littman as Amici Curiae on behalf of Real Parties in Interest.

**OPINION**

**MOSK,** ██ ██ We are concerned in this case with whether tidelands[1] in San Francisco Bay granted to private parties by the state Board of Tide Land Commissioners (board) in the latter part

---

[1] The term "tidelands," properly speaking, are lands between the lines of mean high tide and mean low tide, whereas "submerged lands" are those seaward of mean low tide

of the 19th century, pursuant to a legislative act passed in 1870, conveyed title to the purchasers free of the public trust for commerce, navigation, fishing, and related uses. *Knudson* v. *Kearney* (1915) 171 Cal. 250 [152 P. 541], and *Alameda Conservation Association* v. *City of Alameda* (1968) 264 Cal.App.2d 284 [70 Cal.Rptr. 264], held that these grants were in fee simple and not subject to the rights of the public. We conclude that these decisions were erroneous and must be overturned, but that tracts of land granted by the board that have been improved or filled are, to the degree hereinafter described, free of the public trust.

Santa Fe Land Improvement Company, a corporation, and George W. Murphy (plaintiffs) each brought an action against the City of Berkeley and the State of California (defendants) to quiet title to 79 acres of land located in the City of Berkeley adjacent to the Berkeley Marina, for declaratory relief, and inverse condemnation. Plaintiffs' predecessors in interest had acquired the parcels from the board by deeds issued pursuant to the 1870 act. At the time of acquisition the property was tideland, but all except a small portion has been filled.[2] Plaintiffs alleged that they owned these parcels free of any trust on behalf of the public for commerce, navigation and fishing.

Defendants denied that plaintiffs own the 79 acres in question, and the state filed a cross-complaint,[3] claiming that Berkeley owns the property in fee under a grant from the state,[4] or, in the alternative, that

and not uncovered in the ordinary ebb and flow of the tide. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 478, fn. 13 [91 Cal.Rptr. 23, 476 P.2d 423].) For literary convenience, the term "tidelands" will refer to both types of property in this opinion, unless otherwise noted.

[2]According to defendants, the fill was placed there by Berkeley some time before 1965 under a garbage disposal program.

[3]The cross-complaint was filed by the State Lands Commission, which has jurisdiction over tidelands owned by the state as well as residual jurisdiction of tidelands granted by the state. (See, e.g., Pub. Resources Code, §§ 6216, 6301.) Section 6308 requires that the state be joined as a party in any action involving title to tidelands granted by the state to a local entity.

[4]Berkeley's claim of title stems from statutes enacted in 1913 and thereafter, which granted the state's right to the tidelands within Berkeley's boundaries to the city. (Stats. 1913, ch. 347, § 1, pp. 705-706; Stats. 1915, ch. 534, § 1, pp. 902-903; Stats. 1917, ch. 596, § 1, p. 915; Stats. 1919, ch. 517, § 1, pp. 1089-1090; Stats. 1961, ch. 2180, § 1, pp. 4516-4518; Stats. 1963, First Ex. Sess. 1962, ch. 55, § 1, pp. 343-345.) The city's claim depends upon the extent of the state's interest at the time the grants were made. Our references to the interests of the state or the public in this property apply also to the city's rights.

plaintiffs' title is subject to the public trust. The cross-complaint alleged also that Santa Fe claims 608 acres and Murphy 48 acres of Berkeley's tidelands, comprising 77 percent of that city's entire waterfront, that this additional acreage was, like the 79 acres involved in plaintiffs' complaint, acquired by deeds issued pursuant to the 1870 act, and that Santa Fe asserts that the additional property is also free of the public trust. The cross-complaint sought to include the additional acreage in the action.

Plaintiffs moved for partial summary judgment as to the 79 acres claimed in their complaints. In support of their motion they produced documents establishing that the property had been conveyed by deeds that the board issued between 1872 and 1875 to their predecessors in interest, granting to them "all the right title and interest of the State of California in and to" the property. The trial court granted the motion, deciding under the authority of *Knudson* and *Alameda Conservation* that the deeds issued by the board terminated the public trust in the properties conveyed. ■ ■■■ Defendants seek a writ of mandate to compel the trial court to set aside this order.[5]

Although plaintiffs' motion for summary judgment involved only 79 acres, almost all of which have been filled, the trial court's ruling that the conveyances granted by the board were free of the public trust as of the time they were made affects all the grants by the board pursuant to the 1870 act.

The City of Berkeley is in Alameda County. It borders on the eastern side of the northern reaches of San Francisco Bay (the Bay), and its boundary includes more than two miles of shoreline and a large submerged area to the west. The 79-acre tract involved in plaintiffs' motion borders on the extension of University Avenue running west of the Eastshore Freeway. Approximately one-third of the tract lies between the 1870 lines of mean high tide and mean low tide, and the remainder was submerged land at that time.

---

[5]The trial court determined also that the state was estopped to claim that plaintiffs' property is not free of the public trust because the state took a contrary position in the *Alameda Conservation* case, involving another tract of land conveyed by the board under the 1870 act. We need not dwell on this aspect of the court's ruling. The issue in this case involves a matter of great public importance, and it is settled that the doctrine of collateral estoppel does not apply under such circumstances. (*Chern v. Bank of America* (1976) 15 Cal.3d 866, 872 [127 Cal.Rptr. 110, 544 P.2d 1310].)

The doctrine that the public owns the right to tidelands for purposes such as commerce, navigation and fishing originated in Roman law, which held the public's right to such lands to be "illimitable and unrestrainable" and incapable of individual exclusive appropriation. (See Note, *The Public Trust in Tidal Areas* (1970) 79 Yale L.J. 762, 763, fn. 7.) The English common law developed similar limitations upon private authority over such property: the rights of the public prevailed over the rights of private persons claiming under tideland grants made by the crown. (See Note, *California's Tideland Trust: Shoring It Up* (1971) 22 Hastings L.J. 759, 761-762.) After the American Revolution, the people of each state acquired "absolute right to all...navigable waters, and the soils under them, for their own common use...." (*Martin* v. *Waddell* (1842) 41 U.S. (16 Pet.) 367, 410 [10 L.Ed. 997, 1013].)

When California was admitted to statehood in 1850, it succeeded to title in the tidelands within its borders not in its proprietary capacity but as trustee for the public. (*City of Long Beach* v. *Mansell, supra*, 3 Cal.3d 462, 482; *People* v. *Kerber* (1908) 152 Cal. 731, 733 [93 P. 878]; *Ward* v. *Mulford* (1867) 32 Cal. 365, 372.) ■ Although early cases expressed the scope of the public's right in tidelands as encompassing navigation, commerce and fishing, the permissible range of public uses is far broader, including the right to hunt, bathe or swim, and the right to preserve the tidelands in their natural state as ecological units for scientific study. (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 259-260 [98 Cal.Rptr. 790, 491 P.2d 374].)

There were limitations imposed by this ancient doctrine upon the alienation of tidelands to private parties. *Illinois Central Railroad Company* v. *Illinois* (1892) 146 U.S. 387 [36 L.Ed. 1018, 13 S.Ct. 110], was the seminal case on the scope of the public trust doctrine and remains the primary authority even today, almost nine decades after it was decided. ■ The decision established the principle that a state, as administrator of the trust in tidelands on behalf of the public, does not have the power to abdicate its role as trustee in favor of private parties.

In 1869, the Illinois Legislature granted to the Illinois Central Railroad Company in fee simple 1,000 acres of tide and submerged lands, representing virtually the entire waterfront of Chicago. The only limitations upon the grant were that the railroad company could not

authorize obstruction of the harbor or impair the public right of navigation, and that the Legislature retained the right to regulate wharfage fees when docks were built. Four years later, the Legislature thought better of its action and enacted a measure to revoke the grant, an action which was challenged by the railroad.

The court held that the grant was revocable, and that the state could resume exercise of its trust rights at any time. The decision recognized that parcels of land under navigable waters conveyed to private parties for wharves or docks and other structures in aid of commerce may be granted free of the public trust because such uses are consistent with trust purposes.[6] But it determined that the Legislature did not have the power to convey the entire waterfront of the city to a private party free of the trust. The court declared that one legislature does not have the power to "give away nor sell the discretion of its successors" to "exercise the powers of the State" in the execution of the trust and that legislation "which may be needed one day for the harbor may be different from the legislation that may be required at another day." (See also *Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 207 [282 P.2d 481]; *People* v. *California Fish Co.* (1913) 166 Cal. 576, 593 [138 P. 79].)

The principles of *Illinois Central* have suffered a checkered history in California. Soon after statehood, the Legislature began to sell into private ownership vast tracts of tidelands, often at public auction. In San Francisco Bay, large parcels were sold by deeds purporting to transfer title in fee simple absolute. Many of these transfers were fraudulently made.[7] In 1868, the Legislature created the Board of Tide Land Commissioners. It was directed to take possession of marshland, tideland and submerged land in the City of San Francisco, to establish a waterfront line for the city, and to sell lots within that line, reserving parcels for certain purposes. (Stats. 1867-1868, ch. 543, §§ 1, 4, 5,

---

[6]The court stated also that "grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining" may also be conveyed free of the trust. (146 U.S. at p. 452 [36 L.Ed. at p. 1042].) The meaning of the term "lands and waters remaining" is not clear. The court may have had in mind either former navigable waters which had been filled and were thus no longer useful for navigation, or shoals and swamp lands. In one portion of its opinion, the court quotes from a case in which submerged shoals and flats are characterized as "useless parts" which "really interfered with navigation" and did not "affect the character of the title to the remainder." (*Id.* at p. 457 [36 L.Ed. at p. 1044].)

[7]For example, pursuant to statutory authority, the Surveyor-General was directed to survey tidelands above low tide for sale at "one dollar per acre in gold coin." County

pp. 716-720.) The territorial jurisdiction of the board was extended by a supplementary act in 1870. (Stats. 1869-1870, ch. 388, §§ 1, 2, 3, pp. 541-542.) The property involved in this proceeding was conveyed by board deeds under its extended jurisdiction. The history and content of these measures will be discussed in further detail, *infra.*

The widespread abuses in the disposition of tidelands led to the adoption in 1879 of article XV, sections 2 and 3 of the Constitution (now art. X, §§ 3 & 4). These provisions prohibit the sale to private persons of tidelands within two miles of an incorporated city, and state that no individual may obstruct the free navigation of tidelands on navigable waters nor the right of way to such waters, when required for a public purpose. In the debate that preceded adoption of the measure, one legislator observed that in the preceding 25 years the grants by the state had nearly resulted in "the monopolizing of every frontage upon navigable waters in this state...by private individuals...." (Debates and Proceedings, Cal. Const. Convention 1878-1879, *op. cit.*, at p. 1481.)

As a result of these open-handed policies, today almost one-quarter of the Bay is claimed by private persons. Of the remainder, approximately one-quarter has been granted by the state to cities and counties, the state owns about one-half, and the federal government 5 percent. (S. F. Bay Plan Supp., Bay Cons. & Dev. Com., p. 447.)

■ Two distinct rules developed with regard to the validity of the grants of tidelands made to private parties before the limitations on alienation imposed by the Constitution of 1879. Even before *Illinois Central* was decided, it was recognized in California that the state had the authority as administrator of the trust on behalf of the public to dispose absolutely of title to tidelands to private persons if the purpose of the conveyance was to promote navigation and commerce. (See, e.g., *Eldridge* v. *Cowell* (1854) 4 Cal. 80, 87.) In a series of statutes sometimes called "special acts" the harbor of San Francisco was created: a waterfront line was fixed at a point which reached a depth convenient to shipping, lots and streets were laid out in the water landward of the

---

surveyors of San Mateo and Alameda, who conducted the surveys, "unblushingly certified as 'lands above low tide' thousands of acres that lay six to eighteen feet below the waters of San Francisco Bay...[F]iles of the state Surveyor-General contain no correspondence indicating that the incumbent ever refused" patents applied for by the surveyor of Alameda County. (See Scott, Future of S. F. Bay (1963) Inst. of Gov. Studies, U. of Cal., p. 4; see also Debates and Proceedings, Cal. Const. Convention 1878-1879, pp. 1038-1039, 1478-1481.)

line and were sold to private parties; these lands were filled, and the line thus formed became the harbor line. Much of San Francisco's downtown business district is situated on land filled in connection with the development of the harbor created pursuant to these acts.[8] From the early days of statehood, it was held that conveyances made pursuant to such a program passed title free of the public trust. (See, e.g., *Eldridge v. Cowell, supra,* 4 Cal. 80, 87; *Ward* v. *Mulford, supra,* 32 Cal. 365, 372-373; *Oakland* v. *Oakland Water Front Co.* (1897) 118 Cal. 160, 184-185 [50 P. 277]; see *People* v. *California Fish Co., supra,* 166 Cal. 576, 585.)

But conveyances of tidelands to private parties not made for the furtherance of navigation or commerce did not pass title free of the trust. The acts authorizing such conveyances are sometimes referred to as "general acts." *California Fish,* which contains a comprehensive analysis of the public trust doctrine, recognized this distinction. The effect of the decision was to retain the public's right in vast grants of tidelands purportedly conveyed in fee between 1855 and 1872 to private parties by legislative authorization.[9]

In *California Fish,* as here, private claimants asserted that they owned title to tidelands free of the public trust. The court, after recognizing that absolute title could be granted to private individuals in order to "adapt the land to the use for navigation in the best manner" (166 Cal. at p. 597), held that the grants there involved were not made to improve navigation. In these circumstances, the grantees "own the soil, subject to the easement of the public for the public uses of navigation

---

[8]Contrary to plaintiffs' claim, the 1868 act did not authorize the sale of property that now constitutes the downtown business district of San Francisco. These grants were made under prior statutes (e.g., Stats. 1851, ch. 41, §§ 1, 3, 4, pp. 307-309; Stats. 1853, ch. 160, §§ 5, 7, pp. 220-221), and absolute title to the lands conveyed by these measures was confirmed by early cases (e.g., *Eldridge* v. *Cowell, supra,* 4 Cal. 80, 87).

[9]Almost a dozen statutes authorizing grants of tidelands were consolidated in 1872 Political Code sections 3440 through 3493-1/2. Tidelands conveyed under these statutes excluded areas located within five miles of San Francisco, as well as other areas of the Bay. (Stats. 1861, ch. 356, § 1, p. 363.) Thus, the *California Fish* decision did not affect tidelands included in the 1868 and 1870 acts involved in the present proceeding.

The tidelands conveyed pursuant to the statutes involved in *California Fish* included "the entire sea beach from the Oregon line to Mexico and the shores of every...inlet, estuary, and navigable stream as far up as tide water goes and until it meets the lands made swampy by the overflow and seepage of fresh water streams." (166 Cal. at p. 591.) Perhaps 80,000 acres of tidelands (as distinguished from submerged lands) were conveyed to private parties before *California Fish* was decided. (See Taylor, *Patented Tidelands: A Naked Fee?* (1972) 47 State Bar J. 420, 421.)

and commerce, and to the right of the state, as administrator and controller of these public uses and the public trust therefor, to enter upon and possess the same for the preservation and advancement of the public uses and to make such changes and improvements as may be deemed advisable for those purposes." (*Id.* at pp. 598-599.)

■ The court set forth the following principles regarding the interpretation of statutes authorizing the granting of tidelands: "[S]tatutes purporting to authorize an abandonment of . . . public use will be carefully scanned to ascertain whether or not such was the legislative intention, and that intent must be clearly expressed or necessarily implied. It will not be implied if any other inference is reasonably possible. And if any interpretation of the statute is reasonably possible which would not involve a destruction of the public use or an intention to terminate it in violation of the trust, the courts will give the statute such interpretation." (*Id.* at p. 597.)

■ The first focus of our inquiry, therefore, is whether the act of 1870, which authorized the sale of tidelands to plaintiffs' predecessors in interest, had as its purpose the promotion of navigation, commerce or fisheries.

We begin with the 1868 act. The statute directed the board to establish a waterfront line for San Francisco south of Second Street, divide the property within that line into blocks and lots, reserving space for streets, docks, slips, canals, or other uses necessary for the public convenience and the purposes of commerce, and to sell the state's right, title, and interest in the lots at public auction. (Stats. 1867-1868, ch. 543, §§ 1, 4, 5, pp. 716-720.) The 1870 statute, which was "supplementary to and amendatory of" the 1868 act, added to the board's jurisdiction all tidelands within five miles of the exterior boundary of San Francisco to nine feet of water at extreme low tide. As to these tidelands, the board was authorized to subdivide the property into lots and to sell them at public auction, reserving canals and basins that it deemed necessary for drainage, navigation and commerce. (Stats. 1869-1870, ch. 388, §§ 1, 2, 3, pp. 541-542.) At that time, the boundary of San Francisco extended a considerable distance into the waters of the Bay. (S. F. Bay Plan Supp., Bay Cons. & Dev. Com., *supra*, p. 432.) The 1870 act therefore increased the territory subject to the board's jurisdiction sub-

stantially; the tidelands that the board was authorized to convey under the 1870 act were far greater than under the 1868 statute.[10]

The total acreage placed under the board's jurisdiction under the 2 acts was 56,400 acres of tideland or 88 square miles of the Bay. Of this, the board conveyed 22,299 acres. The area sold pursuant to the 1870 act exceeded many times that conveyed in the City of San Francisco under the 1868 act. Roughly 14,447 acres, or 24 square miles, constituting 64.8 percent of the area under the board's jurisdiction, is still tideland. About 4,186 acres of the subdivided tidelands (18.8 percent) have been filled but not improved, and 3,666 acres (16.4 percent) are both filled and improved with structures. These conveyances extend from Hamilton Air Force Base and Richmond in the northern part of the Bay to San Bruno and San Leandro in the south. In Berkeley,[11] the board sold all the lots extending to 12 feet at ordinary high tide from the shore, granting to the purchasers the entire 2½ miles of the city's waterfront, without any provision for public access. Most of the tidelands in Berkeley are now owned by plaintiff Santa Fe. Of the 854 acres in Berkeley sold under the act, 525 are still under water. In other areas, such as Sausalito, canals providing public access to the Bay were reserved from sale. Over the years, most of the lots sold by the board have been acquired by a relatively small number of corporations that own substantial parcels purchased from the original grantees or their successors. (Scott, Future of S. F. Bay, *op. cit.*, p. 7.)[12]

We come, then, to *Knudson* v. *Kearney* (1915) 171 Cal. 250 [152 P. 541]. That case involved an action to quiet title to less than two acres of tidelands on the shore of San Francisco Bay. The plaintiff,

---

[10]Tidelands previously granted by the Legislature to the City of Oakland were excepted from the terms of the 1870 act. (Stats. 1869-1870, ch. 388, § 1, p. 541.)

[11]Berkeley was not incorporated as a city in 1870, but there was some community development at the site, including a wharf. (See Bowman, *The Birthdays of Urban Communities* (1952) 31 Cal. Hist. Soc. Q. 328-332.)

[12]Scott states: "The names appearing on the books of county assessors are for the most part those of large realty syndicates, banks, title insurance companies, investment houses, railroads, and manufacturing companies. Only in the upper arm of Richardson Bay and the water areas around Strawberry Point, in Marin County, are there still many small owners—two dozen or more. Almost the entire waterfront of Sausalito has been consolidated in recent years by a single syndicate. Just seven owners now control the submerged properties in Corte Madera Bay, among them the Marin Title Guarantee Company, the Utah Construction and Mining Company, the Wells Fargo Bank, and the City Title Company. Less than a score of owners pay taxes on the parcels the state originally sold in San Rafael Bay. On the eastern side of the bay the Santa Fe Railroad has title to almost all the privately held tide and submerged lands from Rich-

characterized by the trial court as an intruder, occupied a parcel that defendant leased from a party who had obtained the property under a deed issued to her predecessor in interest under the 1870 statute. Plaintiff objected to introduction into evidence of the original deed on the ground that the state had no power to convey absolute title to tidelands, citing *California Fish.*

The court, in a discussion that covered less than two paragraphs, held that the plaintiff's assertion was without merit because deeds issued under the 1870 act conveyed absolute title to the grantees. It distinguished the general disposition statutes involved in *California Fish* on the ground that whereas those statutes were not designed to promote navigation, it was "obvious" from the provisions of the 1868 and 1870 measures that they were enacted for that purpose. The *Knudson* opinion states, "These acts provided that the boundaries of navigable waters should be fixed and the waterfront line delineated, and, in effect, that the land not required for docks, piers, slips, or other purposes of commerce should be subject to sale outright to private persons for private use. Reference is made in the opinion in *People* v. *California Fish Co.,* 166 Cal. 576, 585 . . . to the disposition by the state, under these and other similar statutes, of tide-lands cut off from navigation by the fixing of the waterfront of San Francisco. Many decisions are cited which either declare or assume that grants under such laws convey the title in fee. [Citations omitted.] Deeds made under the authority of these and similar acts do not come within the scope of the decision in the California Fish Co. case. . . ." (171 Cal. at p. 253.)

*Knudson* was followed in *Alameda Conservation* in which it was held, without any independent analysis, that tidelands in Alameda conveyed pursuant to the 1870 act were granted free of the public trust.[13]

While it would render our problem much simpler, we cannot agree with defendants' view that the statement in *Knudson* that grantees who

mond to Oakland, and in Richmond alone it owns 1,156.13 acres. The Standard Oil Company possesses more than a thousand acres of offshore properties in Richmond, and claims title to another 640 acres. Along the northern waterfront of San Mateo County the privately held areas covered by the waters of the bay belong to such interests as the Southern Pacific Railroad, the Schilling Estate Company, the Western Title Insurance and Guarantee Company, the Crocker Land Company, Consolidated Western Steel Corporation, and the Utah Construction and Mining Company, not to mention the Ideal Cement Company and the thousands of acres it claims in the south bay."

[13]In two recent cases this court referred to *Knudson. City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 485, footnote 20, merely cites the case, but *Marks* v. *Whitney, su-*

acquired title under the 1870 statute took free of the public trust consti-
tutes dictum. Even if the court could have based its decision on a
narrower ground, it chose not to do so, and this determination was the
sole ground for its decision. In these circumstances it cannot be said
that the statement was only a general expression of opinion not neces-
sary to the discussion, and therefore dictum. (*Achen* v. *Pepsi-Cola
Bottling Co.* (1951) 105 Cal.App.2d 113, 124-125 [233 P.2d 74]; see
also *Weedin* v. *Tayokichi Yamada* (9th Cir. 1925) 4 F.2d 455, 456-457;
*Stockton* v. *Rattner* (1972) 22 Cal.App.3d 965, 969 [99 Cal.Rptr.
787].) We must squarely face the problem created by *Knudson.*

In assessing that decision, we note at the outset that the action was
between two private persons over less than two acres of tidelands, and
that the state was not a party to the action as a representative of the
people's interests in the vast areas of tidelands alienated by the board.
An examination of the original record in the case reveals that the tide-
land trust was barely mentioned by the parties in the total of 19 pages
of briefs filed by them, although there were some obscure references to
the people's interest in tidelands in the printed oral argument. The
court's conclusion on the basis of this meager presentation that the Leg-
islature intended by the 1870 statute to authorize the board to sell to
private parties free of the public trust more than 56,000 acres of tide-
lands requires reexamination. So far as we are aware, the present case
is the first in which a detailed inquiry into the history and purpose of
the 1870 act has been undertaken.

Our analysis convinces us, for the reasons set out below, that *Knud-
son* and *Alameda Conservation* are incorrect. ▇▇ In our consi-
deration of this question, we proceed on the basis of the principles ex-
pressed in *California Fish*: statutes purporting to abandon the public
trust are to be strictly construed; the intent to abandon must be clearly
expressed or necessarily implied; and if any interpretation of the statute
is reasonably possible which would retain the public's interest in tide-
lands, the court must give the statute such an interpretation.

▇▇ The first defect of *Knudson* is that it relied upon the terms of
the 1868 act to justify a conveyance made under the 1870 statute.
While the former made provision for a waterfront line in San Francisco

*pra*, 6 Cal.3d 251, 258, footnote 6, states that the 1868 and 1870 statutes "were
enacted in aid of navigation and for the purpose of providing for the improvement of
designated parts of San Francisco Bay and they operated to free such tidelands from
the public trust. [Citing *Knudson* and *Alameda Conservation.*]"

and reserved streets, docks and other facilities for commerce and navigation, the latter directed the board to convey into private ownership tidelands within five miles of the San Francisco line to nine feet at extreme low tide, reserving only such canals and basins as the board considered necessary for drainage, navigation or commerce. The *Knudson* court relied almost entirely on the language of the 1868 act to justify its conclusion that grants made under the very different language of the 1870 statute were free of the public trust. Certainly, it could not be said that the 1870 act was designed to promote harbor development. It allowed the board to grant the entire waterfront of every community along a substantial portion of the Bay to private persons in fee, without reference to whether or not a harbor would be desirable or possible at any particular point.

Nor is it "obvious," as the court opined, that the 1870 act was designed to improve navigation on the Bay. The statute makes no reference to a specific public improvement to promote navigation, and does not state the improvement of navigation as its purpose. The fact that the word "navigation" is used in the act and that some of the lands within the board's jurisdiction could be withheld from sale for canals and basins needed for navigation is clearly insufficient to justify the conclusion reached by the court. What is required and is missing from the act is a clear intent expressed or necessarily implied that the purpose of the act was to further navigation or some other trust use. In *Illinois Central* the fact that the grant to the railroad prohibited it from impairing the right of navigation did not prevent the United States Supreme Court from holding that the conveyance violated the trust.

Confirmation that the grants were not intended to be free of the public trust is provided by legislative history. The Attorney General advised the Legislature prior to the enactment of the 1868 statute that the public would retain its right to the tidelands conveyed under the act. In a letter of advice attached to the report of the committee appointed to study the measure, the Attorney General wrote: "The State, in making this disposition [of tidelands], passes the title with the same disability which obtains with the State. Her purchaser can acquire from the State no such title as will enable the owner or holder of them to use them to the detriment, destruction or prejudice of commerce or navigation. For such uses the public have an easement, and the Government retains and has the authority to enforce the right." (Rep. Assem. Special Com. in Relation to S. F. Tide Lands, 2 Appen. to Sen. and Assem. J. (1866-

1867) p. 6.)[14] Moreover, there is evidence that the Legislature may have been primarily motivated by a desire to raise revenue rather than to improve navigation. The committee's report to the Legislature before the 1868 act was passed, as well as reports by the Governor to the Legislature and by the Attorney General to the Governor regarding the progress of the disposition program, refer only to the funds that would be or had been realized from the sales authorized by the act; they are devoid of any reference to the improvement of navigation.[15] Presumably, the Legislature which amended and supplemented the 1868 statute in 1870 was aware of the committee's report and some of the additional matters referred to above. While this evidence of legislative intent is not determinative, at the very least it reinforces our conclusion that the 1870 statute may and should be interpreted to preserve the

---

[14]Plaintiffs argue that the use of the word "Government" in the Attorney General's advice letter indicates that he was referring to the federal government's right to regulate obstructions to navigation rather than the state's power to alienate tidelands free of the public trust. We doubt the correctness of this argument in view of the language quoted above. In any event, it cannot be said that the construction urged by plaintiffs is compelled by the language of the Attorney General. In view of the rules of construction referred to above, we must adopt the interpretation that favors retention of the public trust.

[15]The committee report recommending passage of the act states in part, "There is quite a considerable tract of land of the character referred to in this bill within the limits of the City and County of San Francisco—that former legislative bodies of this State, within the past few years, have made large grants of the most valuable portions thereof to associations at nominal price, by which the State has received but slight benefit.... [The bill] proposes, to the greatest extent that is possible, by sales in small tracts, to protect the interest of the State at large and render contribution from that source to the General Fund.... The undersigned, of your Committee, are fully impressed with the belief that some disposition should be speedily made of the State's interest in the lands referred to in this bill, that they may be improved and made a productive, tax-paying estate, from which the State would derive large acquisitions to her revenue." (Rep. Assem. Special Com., *op cit.*, pp. 3-4.)

An attorney, Creed Haymond, had been retained by the committee to give his opinion on certain legal issues with regard to the measure. The committee requested him to render an opinion on the merits of the bill. In a letter attached to the committee's report, he stated, "If rumor is to be credited, these lands have been a fruitful source of corruption and have been made the foundation of gigantic lobby schemes—the State has been despoiled of her interest in valuable portions of them, and the time has arrived that an end should be put to schemes that grow out of their retention by the State. Whilst the Legislature has the power to give them away lot by lot to private parties, it has not the moral right to so dispose of them. Our State is burdened with a debt of five millions of dollars and the people are weighed down by taxation.

"If these lands are sold under the provisions of the... bill, the State will receive into her Treasury more than a million of dollars. That sum applied to the redemption of State bonds will not only improve the credit of the State, but enable the Legislature to materially reduce taxation—a consummation most devoutly to be wished for." (Rep. Assem. Special Com., *op cit.*, p. 10.)

The Attorney General, in his annual report to the Governor, stated: "I congratulate your Excellency and the people of the State upon the success of the plan devised at the

public's rights in the tidelands that it authorized the board to convey to private parties.[16]

*Knudson* was incorrectly decided even if the court had been justified in concluding that the purpose of the 1870 act was to promote navigation. *Illinois Central* holds that a state may not grant to private persons tidelands as vast in area as the board was authorized to sell by the 1870 act. Such action amounts to an improper abdication by the state of its role as trustee on behalf of the people.

Moreover, *Knudson* was decided in 1915, 40 years after the grants were authorized. Since a very substantial percentage of the tidelands conveyed under the act had not been filled during the intervening years, any program for harbor development or the improvement of navigation had not been realized. *Illinois Central* makes it clear that one legislature may not sell the discretion of its successors to exercise the state's power as the trustee of tidelands. *Knudson* clearly violated this admonition by holding that the trust was terminated as to these tidelands even though 40 years after the grants were made, the plan for improving navigation, which was the purported purpose of the 1870 statute, had not been fulfilled. (See Comment, *The Tideland Trust* (1974) 21 UCLA L.Rev. 826, 844-847, fns. 90, 93.) As to the status of these tidelands at the present time, the McAteer-Petris Act, passed in 1965 (Gov.

---

last session of the Legislature (Act approved March 30th, 1868, Statutes 1867-8, pages 716 to 722, inclusive) for the sale and disposition of the State's interests in certain salt marsh and tide lands bordering upon the Bay and within the City and County of San Francisco. Up to the present time, notwithstanding the unprecedented stringency of the money market, the sales of these lands, under the provisions of the Act, amount to the sum of eight hundred and thirteen thousand one hundred and eight dollars and seventy-four cents ($813,108.74), leaving a large part of the most valuable of those lands still to be sold. I am well assured that the sums which have been and will be hereafter realized from this source (even after paying the sum of two hundred thousand dollars to the University Fund) together with the sums accruing from the ordinary sources of revenue, will, with proper economy, within a short time extinguish the State debt, thereby placing the credit of our State where it of right belongs—amongst the first in the Union, and by reason of light taxation and a State unincumbered with debt, enable us to hold out increased inducements to immigration." (1 Appen. to Sen. and Assem. J. (1867-1869) Rep. of Atty. Gen., p. 6.)

Governor Haight similarly emphasized the monetary benefit of the sales in his remarks to the Legislature in December 1869. (Sen. J. (1869-1870) Governor's Message, pp. 40, 51.)

[16]The matters set forth above regarding the Legislature's intent apply to both the 1868 and 1870 enactments. Nevertheless, there can be no doubt that the promotion of harbor development may be more readily inferred from the language of the earlier statute. We are directly concerned in the present case only with the meaning of the 1870 act, and our holding applies only to it.

Code, § 66600 et seq.), a statute enacted in the state's capacity as trustee of the tidelands (see *People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 544-549 [72 Cal.Rptr. 790, 446 P.2d 790]), demonstrates that the Legislature's current policy regarding these lands is different from that expressed by the 1870 act.

Finally, a number of cases had held or stated long prior to *Knudson* that a grant of tidelands, even if made for the improvement of navigation, does not vest absolute title in a private party until the improvements are actually made. (See, e.g., *People* v. *Williams* (1884) 64 Cal. 498, 499 [2 P. 393]; *People* v. *Kerber, supra,* 152 Cal. at pp. 736-737; *California Fish, supra,* 166 Cal. at pp. 599-600; see also Comment, *supra,* 21 UCLA L.Rev. 826, 844-847, fns. 90, 93.) Since no program of improvement was realized, *Knudson's* holding was in error on this ground also. Thus, under every rationale, *Knudson* is clearly incorrect, and the opinion is overruled. *Alameda Conservation* is disapproved insofar as it follows the holding of *Knudson.*

■ Our conclusion is made with due recognition of the special role of the "rule of property" in the application of the doctrine of stare decisis. As explained in *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 456-457 [326 P.2d 484], the doctrine relates to a "settled rule or principle, resting usually on precedents or a course of decisions, regulating the ownership or devolution of property. . . . [D]ecisions long acquiesced in, which constitute rules of property or trade or upon which important rights are based, should not be disturbed, even though a different conclusion might have been reached if the question presented were an open one, inasmuch as uniformity and certainty in rules of property are often more important and desirable than technical correctness. Thus, judicial decisions affecting the business interests of the country should not be disturbed except for the most cogent reasons, as where the evils of the principle laid down will be more injurious to the community than can possibly result from a change, or upon the clearest grounds of error." (See also *County of L. A.* v. *Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 392-393 [196 P.2d 773].)

■ There are "most cogent reasons" in the present case for our determination to overturn *Knudson* and *Alameda Conservation.* We do not divest anyone of title to property; the consequence of our decision will be only that some landowners whose predecessors in interest acquired property under the 1870 act will, like the grantees in *California Fish,* hold it subject to the public trust. The *Knudson* decision in 1915

and *Alameda Conservation* 53 years later were the only cases holding that the grants in issue were free of the public trust, and it was apparent from the face of the *Knudson* opinion that although the public's right to large tracts of tidelands in the Bay was at stake, the state as trustee of those rights was not a party to the action. The summary and conclusory nature of the decision of the issues in *Knudson*, virtually devoid of reasoning, undermines its status as substantial authority. Finally, these decisions have not been overturned on some minor technicality: to the contrary, our conclusion is based on a studied analysis revealing that they are wholly in error, failed to follow prior law on the subject, and misinterpreted the Legislature's intention. (See *Hart* v. *Burnett* (1860) 15 Cal. 530, 597-612; *Brekke* v. *Crew* (1920) 43 S.D. 106 [178 N.W. 146, 154].)

*Hart* overturned a "rule of property" affecting the City of San Francisco's "magnificent endowment" in public lands acquired when the city was incorporated. The court's justification for its action is particularly appropriate here: "Must we persevere in these errors, no matter how great, or how much opposed to justice they may be, even after new lights, new authorities, and new laws are brought to our notice, proving these mistakes beyond a doubt? We cannot believe that any Court would sustain such a doctrine respecting its decisions." (15 Cal. at p. 611.)

The consequences of allowing the patently erroneous decisions to stand in the present case would be to deprive the people of the state of full control over many thousand acres of tidelands acquired by them at the time of statehood. In these circumstances, and with the limitations upon reassertion of the public's trust rights which we outline below, we do not doubt that it would be more injurious to the public interest to perpetuate the error of *Knudson* and *Alameda Conservation* than to overturn those decisions.

Finally, we reach a crucial question: whether to give our determination full retroactive effect. We note in this connection that *California Fish*, decided in 1913, involved grants of tidelands purportedly in fee to private parties, authorized by almost a dozen different statutes enacted between 1861 and 1872. The extent of the lands involved in that case was far greater than those authorized for sale by the 1870 act (see fn. 9, *ante*), and presumably the improvements made by the grantees were substantial. Yet in that case our court did not hesitate to hold the conveyances were subject to the public trust. Of course, any improvements

made on such lands could not be appropriated by the state without compensation. (*Illinois Central, supra,* 146 U.S. at p. 455 [36 L.Ed. at p. 1043]; Pub. Resources Code, § 6312.)

We could, like the court in *California Fish,* declare that all grants made under the 1870 act are subject to the public trust, or we could hold that our decision is prospective only. We reject both these alternatives. The first would reduce the value of investments that may have been made in reliance on the decisions we overturn, without necessarily promoting the purposes of the trust; while the second would render our holding in this case an academic exercise, because the grants were made more than a century ago.

We choose, instead, an intermediate course: the appropriate resolution is to balance the interests of the public in tidelands conveyed pursuant to the 1870 act against those of the landowners who hold property under these conveyances. In the harmonizing of these claims, the principle we apply is that the interests of the public are paramount in property that is still physically adaptable for trust uses, whereas the interests of the grantees and their successors should prevail insofar as the tidelands have been rendered substantially valueless for those purposes.

In keeping with this principle, we hold that submerged lands as well as lands subject to tidal action that were conveyed by board deeds under the 1870 act are subject to the public trust. Properties that have been filled, whether or not they have been substantially improved, are free of the trust to the extent the areas of such parcels are not subject to tidal action.[17] Tidelands that have been neither filled nor improved are not only the most suitable for the continued exercise of trust uses, but because there is only a remote likelihood that these parcels may be filled (see 33 U.S.C. § 401 et seq.; Gov. Code, § 66600 et seq.; *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 570-573 [89 Cal.Rptr. 897]) the economic

---

[17]Defendants' pleadings alleged that plaintiffs acquired no title whatever by the board deeds and that Berkeley owns the tidelands conveyed by those deeds in fee. Acceptance of this claim would return us to the law as it existed prior to *California Fish.* Before that case was decided, grants of tidelands conveyed in violation of the trust were held to be either void or voidable. (*Kimball* v. *Macpherson* (1873) 46 Cal. 103, 107; *Taylor* v. *Underhill* (1871) 40 Cal. 471, 473.) These determinations were modified in *California Fish,* which held that lands conveyed in violation of the trust were subject thereto. The suggestion of defendants that no title passed by the board deeds is unnecessarily draconian in its effect. As we point out above, there are means to achieve a

loss to the grantees of such lots is speculative at best and is clearly outweighed by the interests of the public.[18]

An obvious illustration of absolute title is a parcel that no longer has Bay frontage. Such property is valueless in its present state for trust uses. Defendants urge us, however, to include reclaimed but unimproved land with Bay frontage in the areas subject to the trust on the ground that such property may still be useful for the exercise of the public trust. To the contrary, we believe that in balancing the interests at stake, the public right in such parcels may be adequately protected by our holding that only the tidal portions thereof are subject to the trust, coupled with the requirement of section 66602 of the Government Code that maximum feasible public access, consistent with a proposed project, must be provided to the shoreline of the Bay.[19]

We are not unaware that the implementation of our holding in the manner set forth above makes assumptions which are not valid in every case. Thus, for example, some reclaimed land might be eminently useful for trust purposes, and numerous persons who reclaimed or improved tidelands purchased under the 1870 act may not in fact have relied on either *Knudson* or *Alameda Conservation.* Indeed, many parcels affected by our decision may have been improved before *Knudson* was decided in 1915. Nevertheless, our broad assumptions are justified by the need to avoid the enormous burden of individual adjudications of such questions and to preclude clouding the titles of landowners around the Bay who own filled or improved properties conveyed under the 1870 act.

---

substantial part of the objectives of the public trust by means which do not eliminate all the property rights of landowners whose predecessors in interest acquired title under the 1870 act.

[18]*Appleby* v. *City of New York* (1926) 271 U.S. 364 [70 L.Ed. 992, 46 S.Ct. 569], relied upon by defendants, is distinguishable. There, the city had conveyed lots below tidewater to the plaintiffs for the specific purpose of developing a harbor. Later, the city built piers adjacent to the lots, and its tenants used the lots for mooring. It was held that under the laws of New York, the plaintiffs had received fee title to the lots, and they were thus entitled to an injunction to prevent the city from using the property for mooring. Since the grants made to plaintiffs in the present case were not to promote navigation, their titles, unlike that of the plaintiffs in *Appleby*, are subject to the public trust.

[19]A number of cases hold or state that the reclamation of tidelands subject to the public trust does not, without more, terminate the trust. (E.g., *Marks* v. *Whitney, supra*, 6 Cal.3d 251, 261; *Atwood* v. *Hammond* (1935) 4 Cal.2d 31, 40 [48 P.2d 20].) But these cases did not involve the interests of landowners who had reclaimed tidelands in reliance upon decisions that were subsequently overruled.

We appreciate also that there may be some improvements upon tideland areas, such as docks, in which a landowner's reliance interest should be recognized to some degree. It is impossible to anticipate in this opinion every conceivable nuance in the application of the basic principle set forth above. Individual variations may be revealed subsequently, requiring further explication of the principles declared herein through future adjudication.

Let a peremptory writ of mandate issue, directing the trial court to set aside its order granting plaintiffs' motion for partial summary judgment and to proceed in accordance with the views expressed herein.

Bird, C. J., Tobriner, J., and Newman, J., concurred.

**CLARK, J.,** Dissenting.—Thousands of pleasure boats, freighters, docks, and harbor areas frame San Francisco Bay as testimonials to the wisdom of the Legislature in creating, and this court in upholding, a "public trust for commerce, navigation, fishing and related uses." (*Ante*, p. 519.)

Principal trust purposes are promotion of commerce, navigation and fishing, and not maintenance and protection of tidelands as some would have us believe.

For over 100 years California citizens have progressively improved the bay edges, demonstrating their reliance on the legislative acts before us today as having conveyed trust-free title. Likewise, state and local governments and the public at large have acquiesced in and endorsed those activities, revealing they too recognize the law as authorizing trust-free conveyances. Given the contemporaneous and longstanding construction of the law by public authority, private individuals and our courts, it is presumptuous for the majority of this court to now tell us the Legislature never intended to permit such progress.

Persons lacking vision and understanding 130 years ago might have argued that trust purposes could not be furthered in the Bay Area by terminating the trust as to a substantial portion of the tidelands.

However, room for argument no longer exists. History has taught its lesson, and there is overwhelming proof that terminating the trust as to part of the tidelands and submerged lands furthered trust purposes by permitting public utilization of the bay. As early as 1854, this court

upheld termination of the tideland trust to further trust purposes stating it was "so self-evident that it needs no argument to prove" that in the bay, some land had to be filled in order to build a port of sufficient depth for ships. (*Eldridge* v. *Cowell* (1854) 4 Cal. 80, 84.)

It is conceivable that even if the trust were not terminated, similar widespread utilization of the bay for trust purposes might have been achieved by private or government facilities. But such speculation is unnecessary. Termination of the trust as to large portions of tideland —affirmed by the court in *Knudson* v. *Kearney* (1915) 171 Cal. 250 [152 P. 541]—has resulted in numerous facilities permitting widespread public use of the bay's resources.

Because the trust purposes have been fulfilled by termination of the trust—particularly through the Legislature's policy encouraging dredging and filling tidelands for public and private harbors—it is unnecessary to guess whether those purposes would have been fulfilled had the trust not been terminated.

Recognizing the Legislature's success in promoting trust purposes—a matter as obvious in 1915 to the justices who unanimously decided *Knudson* as it is today—I am satisfied that, as demonstrated below, proper application of trust principles requires reaffirmance of that decision.

It is well established that tidelands and submerged lands owned by the state are held in trust for the public purposes of navigation, commerce and fisheries. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 482 [91 Cal.Rptr. 23, 476 P.2d 423]; *People* v. *California Fish Co.* (1913) 166 Cal. 576, 584 [138 P. 79].) Tidelands subject to the trust may not be alienated into absolute private ownership; an attempted conveyance of such land transfers "only bare legal title," and the property remains subject to the public trust easement. (*Id.*) Cases have established that the trust is a limitation on governmental as well as private reclamation activities. (*City of Long Beach* v. *Mansell, supra*, 3 Cal.3d 462, 482-486; *Atwood* v. *Hammond* (1935) 4 Cal.2d 31, 38 [48 P.2d 20]; *City of Oakland* v. *Williams* (1929) 206 Cal. 315, 327-328, 330-331 [274 P. 328].) Additionally, oil and gas leases to tidelands and submerged lands have been approved on grounds there would be no serious impairment of trust purposes and that public policy warranted development of mineral resources lying beneath submerged lands. (*Boone* v. *Kingsbury* (1928) 206 Cal. 148, 192-194 [273 P. 797].)

Conversely, cases have indicated that reclamation for general purpose county and municipal buildings and governmental housing projects does not further trust purposes. (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 482; *Atwood* v. *Hammond, supra,* 4 Cal.2d 31, 37 et seq.; *Alameda Conservation Assn.* v. *City of Alameda* (1968) 264 Cal. App.2d 284, 286 [70 Cal.Rptr. 264].) The main effect of the rulings is that under the trust tidelands may be filled and used for commercial and recreational purposes but not residential purposes.

Apart from advancing trust purposes through reclamation, the "'state in its proper administration of the trust may find it *necessary* or *advisable* to cut off certain tidelands from water access and render them useless for trust purposes. In such a case the state through the Legislature may find and determine that such lands are no longer useful for trust purposes and free them from the trust. When tidelands have been so freed from the trust—and if they are not subject to the constitutional prohibition forbidding alienation—they may be irrevocably conveyed into absolute private ownership.' (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 482.)" (Italics added.) (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 260 [98 Cal.Rptr. 790, 491 P.2d 374]; see *Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 206 [282 P.2d 481].)

In the leading case of *People* v. *California Fish Co., supra,* 166 Cal. 576, the court recognized: "It is also settled that in the administration of this trust when the plan or system of improvement or development adopted by the state for the promotion of navigation and commerce cuts off a part of these tide lands or submerged lands from the public channels, so that they are no longer useful for navigation, the state may thereupon sell and dispose of such excluded lands into private ownership or private uses, thereby destroying the public easement in such portion of the lands and giving them over to the grantee, free from public control and use. On this subject in *Illinois C. Ry. Co.* v. *Illinois,* 146 U.S. 452 [36 L.Ed. 1018, 13 Sup.Ct.Rep. 118], the court said: 'It is grants of parcels of lands under navigable waters, that may afford the foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the state.' (*Ward* v. *Mulford,* 32 Cal. 372; *Taylor* v. *Underhill,* 40 Cal. 473; *Kimball* v. *Macpherson,* 46 Cal. 107, 108; *Oakland* v. *Oakland W. F. Co.,* 118 Cal. 184 [50 Pac. 277]; *People* v.

*Kerber*, 152 Cal. 733 [125 Am.St.Rep. 93, 93 Pac. 878]; *Messenger* v. *Kingsbury*, 158 Cal. 613, [112 Pac. 65].) The most striking instance of the exercise of this power of absolute disposition of such tide or submerged lands by the State of California is found in the laws providing for the improvement of the waterfront of San Francisco. By these laws the water-front line was fixed, cutting off from navigation a large area of land which was subject to the daily flux and reflux of the tides and part of the lands always under water, upon which line a sea-wall was constructed, and the area landward of this wall was subsequently surveyed into lots and streets, sold into private ownership and filled in for private use. This area now constitutes a large portion of the business section of San Francisco. The following cases recognize the authority of the state to make such absolute disposition of these particular lands: *Eldridge* v. *Cowell*, 4 Cal. 87; *Guy* v. *Hermance*, 5 Cal. 74 [63 Am. Dec. 85]; *Hyman* v. *Read*, 13 Cal. 444; *Holladay* v. *Frisbie*, 15 Cal. 634; *Wheeler* v. *Miller*, 16 Cal. 125; *Seabury* v. *Arthur*, 28 Cal. 142; *People* v. *Klumpke*, 41 Cal. 277; *Knight* v. *Haight*, 51 Cal. 171; *Friedman* v. *Nelson*, 53 Cal. 589; *Le Roy* v. *Dunkerly*, 54 Cal. 459; *Knight* v. *Roche*, 56 Cal. 21; *People* v. *Williams*, 64 Cal. 498 [2 P. 393]; *San Francisco* v. *Straut*, 84 Cal. 124 [24 Pac. 814]." (166 Cal. at pp. 585-586.)

The instant program was one of three instituted by the Legislature to convey tidelands and submerged lands. The first terminated the trust to establish part of the San Francisco, Oakland, and other city waterfronts on San Francisco Bay. (*Eldridge* v. *Cowell, supra,* 4 Cal. 80; *Guy* v. *Hermance* (1855) 5 Cal. 73; *Oakland* v. *Oakland Water Front Co.* (1897) 118 Cal. 160, 185, 201 [50 P. 277]; see *Shirley* v. *City of Benicia* (1897) 118 Cal. 344, 346 [50 P. 404].) Under this program, the Legislature adopted a series of so-called "special acts" delineating a permanent waterfront line, approving maps setting forth streets and blocks for tidelands and submerged lands located inshore of the line, authorizing sales of the lands, and confirming private titles held in the lands. (E.g., Stats. 1851, ch. 41, p. 307; Stats. 1853, ch. 160, p. 219; Stats. 1855, ch. 181, p. 226.) Purchasers filled the property conveyed and deepwater ports were ultimately established.

In the first of the cases holding that conveyances pursuant to the special acts were free of the tidelands trust, this court in 1854 recognized: "In the plan of the City of San Francisco, the survey into blocks, lots and streets, extended into the tide waters in front of the City, the object

of which was to reach a sufficient depth of water, on the land line, for the convenience of shipping. It was necessarily anticipated that the water lots would be filled up to a level suitable for building or land carriage. That this was perfectly legitimate, in the establishment of a seaport town, is so self-evident that it needs no argument to prove it." (*Eldridge* v. *Cowell, supra*, 4 Cal. 80, 87.) Our court held that because the state had statutorily "recognized" the city plan, the defendant who had purchased and filled his lot was free of the trust. (*Id.*)

The second program was one of general disposition, statewide in scope from the Oregon line to Mexico, excepting San Francisco Bay. The statutes did not establish waterfront lines or otherwise attempt to determine tideland or harbor development. Almost all of the tidelands encompassed were unsuitable for harbor development. In *People* v. *California Fish Co., supra*, 166 Cal. 576, we held that all tidelands and submerged lands conveyed pursuant to that program were subject to the trust because no enabling statute indicated a legislative intent to promote or regulate navigation, commerce, and fishing.

The third program involving the lands in the instant case was established by the acts of 30 March 1868 (Stats. 1867-1868, ch. 543, p. 716) and 1 April 1870 (Stats. 1869-1870, ch. 388, p. 541). By then the Legislature was obviously aware of (1) this court's decisions holding the special acts terminated the trust and (2) the success of the special acts in furthering trust purposes. The 1868 and 1870 acts were intended to give the remainder of San Francisco and nearby communities the same opportunities to develop harbors, commerce, and fishing facilities as had been given to portions of San Francisco and Oakland by the special acts.

The 1868 act created the Board of Tideland Commissioners (BTLC), and empowered it to survey and sell at public auction certain salt marsh, tide and submerged lands within San Francisco. The act directed the BTLC to establish a waterfront line and to reserve lands for "streets, docks, piers, slips, canals, drains or other use necessary for the public convenience in the purposes of commerce."

The 1870 act "supplementary to and amendatory of" the 1868 act extended the BTLC's jurisdiction to lands within five miles of San Francisco which were covered by less than nine feet of water at low

tide. BTLC was directed to survey the land, sell lots, establish two 600-foot wide canals, and reserve canals and basins wherever they deemed necessary "for the purpose of drainage, navigation and the wants of commerce." All lot subdivisions required approval by a state board composed of the Governor, the Surveyor-General, and the Controller. With respect to lands adjacent to the Berkeley area, BTLC divided about one-third into lots and reserved the remaining two-thirds to "navigation and the wants of commerce."

It is estimated that while 88 square miles of the bay were under its jurisdiction, BTLC subdivided for sale approximately 36 square miles. It is also estimated that only 12 square miles have been filled and that about 6 square miles have been improved by homes, businesses and industries valued at over $2.5 billion. Included are substantial portions of San Francisco, Corte Madera, Richmond and other communities.[1]

*Knudson* held BTLC conveyances pursuant to the 1868 and 1870 acts, like conveyances pursuant to the "special acts," are trust-free conveyances. Relying upon *Knudson*, several subsequent cases have reaffirmed that conveyances pursuant to the 1868 and 1870 acts are free of the trust. (*Marks* v. *Whitney, supra*, 6 Cal.3d 251, 258, fn. 6; *City of Long Beach* v. *Mansell, supra*, 3 Cal.3d 462, 485, fn. 20; *Alameda Conservation Assn.* v. *City of Alameda, supra*, 264 Cal.App.2d 284, 287.)

Claiming *Knudson* is contrary to *California Fish*, and is based on a mischaracterization of the 1868 and 1870 acts, petitioners urge us to repudiate *Knudson*. We should reject the invitation.

In *Knudson*, plaintiff sued to quiet title to a two-acre parcel of tideland, arguing his occupancy conferred a title superior to that of defendant, who held title under the 1868 and 1870 acts. Plaintiff argued under *California Fish* that defendant's title was subject to the public trust and title by possession prevailed over such a limited private title. The holding in *California Fish* was distinguished because it in-

---

[1]Lands sold by the BTLC appear to include: Parts of the Marina District in San Francisco; lands extending south from Second Street in San Francisco to San Francisco Airport; Marin County from Sausalito north to Hamilton Air Force Base, including parts of downtown Corte Madera and San Rafael; the East Bay from Oakland north to San Pablo and from Oakland south to San Leandro, including portions of Richmond and Emeryville, among other cities.

volved grants made under the general disposition program, which was not enacted in furtherance of trust purposes. In contrast, the court asserted it was "obvious" the 1868 and 1870 acts were enacted in aid of navigation. In support of this position, the court pointed out the acts provided for improving San Francisco Bay "so as to make it more suitable for navigation" by delineating the boundaries of navigable waters and fixing the waterfront line with the BTLC empowered to determine what land was required for "streets, docks, piers, slips, canals, drains or other uses necessary for public convenience," the surplus to be sold to the public in absolute fee. (171 Cal. at p. 251.)

The *Knudson* court correctly construed the 1868 and 1870 acts as providing for conveyances free of the trust. As a general rule, the legislative determination that land shall be severed from the public trust "is conclusive upon this court in the absence of evidence indicating that the abandonment of the public trust will impair the power of succeeding legislatures to protect, improve, and develop the public interest in commerce, navigation, and fisheries." (*Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 207 [282 P.2d 481]; *County of Orange* v. *Heim* (1973) 30 Cal.App.3d 694, 717 [106 Cal.Rptr. 825].)

The *Knudson* court reasonably interpreted the 1868 act as demonstrating a legislative intent to further the public interest in commerce, navigation and fishing. It is evident the Legislature exhibited concern for the public trust when it adopted that plan to fix the boundaries of navigable waters, delineate the waterfront line and sell for private use land that BTLC determined was not required for docks, piers, slips or other purposes of navigation. Given the detail of the 1868 act with respect to the BTLC's duties in planning the harbor area, it follows, as the *Knudson* court concluded, the acts "were enacted in aid of navigation and for the purpose of providing improvement of San Francisco Bay, so as to make it more suitable for navigation." (171 Cal. at p. 253.)

The 1870 act was expressly enacted "supplementary to and amendatory of" the 1868 act and, as such, was promulgated with the same concern toward trust purposes reflected in the earlier act. For this reason, I must reject the majority's reliance on some minor differences between the acts as a basis for distinguishing them.[2]

---

[2]Although the majority purport in places to separate the 1868 and 1870 acts, in other places they are grouped. For example, the Attorney General's opinion relied upon related to the 1868 act but is used to construe the 1870 act.

Three additional factors fortify the conclusion that conveyances by the BTLC pursuant to the 1868 and 1870 acts were free of the trust. The historical context demonstrates the success of the "special acts" in establishing harbor facilities through the combined use of public and private capital. The 1868 and 1870 acts were obviously patterned after the earlier "special acts." The difference is that in the earlier "special acts" the Legislature itself fixed the waterfront lines and provided for retention of property for navigation, commercial, and fishing purposes. Under the 1868 and 1870 acts, the Legislature delegated to the BTLC the duty to fix the waterfront line and to determine which properties were useful and to be retained for trust purposes. (As to the 79 acres involved in the present case, the parallel to the San Francisco waterfront is complete. Like the San Francisco piers, the Berkeley marina is on the bayward side of the conveyed and filled property.)

Secondly, the claim of conflict between *California Fish*, the main case relied upon by petitioners, and *Knudson* must be considered in light of the fact that both opinions were authored by Justice Shaw, that *Knudson* was decided 21 months after *California Fish*, and that six of the seven justices participating in *California Fish* participated in the unanimous determination in *Knudson*. The 66 pages of majority, concurring, and dissenting opinions in *California Fish* and companion cases by three justices demonstrate their scholarly knowledge of the trust doctrine, and I must reject the claim that our court in *Knudson* was not fully aware of the doctrine. Far from indicating a lack of understanding of the issue, the brevity of the *Knudson* opinion indicates that the able justices believed determination of the issue simple and clear.

Thirdly, the *Knudson* court was certainly aware that in the 45 years between adoption of the legislation and its decision, thousands of private parties were openly and notoriously dredging, filling, improving, and using tidelands indicating their understanding the legislation permitted these activities. The legislative, executive, and local governments, by acquiescing and encouraging these activities, reflected the same construction of the legislation. Today's remarkable rejection of such contemporaneous and longstanding construction presents ominous possibilities for future use of this rule of construction. (Cf. *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 349, fn. 4 [158 Cal.Rptr. 350, 599 P.2d 656]; *Rivera v. City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793]; *Coca Cola Co. v. State Bd. of Equalization* (1945) 25 Cal.2d 918, 921-923 [156 P.2d 1]; *Whitcomb Hotel, Inc. v. California Employment Comm.*

(1944) 24 Cal.2d 753, 756-758 [151 P.2d 233, 155 A.L.R. 405]; *Worthington* v. *Unemployment Insurance Appeals Bd.* (1976) 64 Cal. App.3d 384, 389 [134 Cal.Rptr. 507].)

The majority assert that the acts impair the power of succeeding legislatures to protect, improve, and develop the public interest in commerce, navigation, and fisheries. There is, however, no showing to this effect. The numerous public-private developments throughout the bay tell us the contrary—emphasizing the wisdom of the legislative plan to permit private and public bay development. Specifically, the 1868 and 1870 acts did not prevent the City of Berkeley from developing its marina on the bayward side of property conveyed by the Tideland Commissioners to defendants' predecessors.

Arguing that the Legislature never intended to terminate the trust by the 1868 and 1870 acts, the majority rely primarily on a report of the Attorney General. (Appen. to Sen. and Assem. J., vol. 2, 17th Sess. 1868.) That report briefly discussed how the state's title in the tidelands at issue would "vest...in others through the action of the [Board of Tideland] Commissioners." (*Id.*, at p. 6.) Reliance is placed on the following language: "The State, in making this disposition of those lands, passes the title with the same disability which obtains with the State. Her purchaser can acquire from the State no such title as will enable the owner or holder of them to use them to the detriment, destruction or prejudice of commerce or navigation. For such uses the public have an easement, and the *Government* retains and has the authority to enforce the right." (*Id.*; italics added.)

The Attorney General's statement fails to establish legislative intent to continue the tideland trust as to lands conveyed pursuant to the acts. By noting the "Government" retains the right to enforce an easement, the Attorney General was referring to the United States government, not the state government. Earlier in the Attorney General's report, and in several places in a second opinion submitted to the Assembly Committee, the United States government is referred to as the "Federal Government" or the "General Government." Nowhere in either report is the State of California called the "Government"; rather, both the Attorney General and Senator Creed Haymond, author of the second report, consistently speak of California as "the State" or the "State of California."

Thus, it appears the Attorney General was reiterating the established rule of law that although the state has absolute power to convey land underlying navigable water, state transfer does not terminate the federal right to regulate obstruction to navigation. (*Colberg Inc.* v. *State of California* ex rel. *Department of Public Works* (1967) 67 Cal.2d 408, 416 [62 Cal.Rptr. 401, 432 P.2d 3].) He was not advising the Legislature that the state was retaining an easement in the tidelands at issue. Senator Creed Haymond's report supports such interpretation of the legislative intent. He advised the Assembly Committee: "[I]t follows that the State of California is the owner of the shores and soils under the navigable waters within her limits; that she holds the same by virtue of her state sovereignty, with full power to alienate them, subject only to the right of conservation resting in the General Government." (Report Assem. Special Com. in Relation to S. F. Tide Lands, p. 8, Appen. to Sen. and Assem. J., vol. 2, 17th Sess. 1868.)

It has been suggested both acts reveal little public purpose beyond raising revenue for the state and that the 1870 act disposed of public land preserving only minimal navigational access. (See Comment (1972) 60 Cal.L.Rev. 225, 251-252.) However, there is little support for such an interpretation. In the report discussed above, references to revenue from land sales were not made with respect to a sole purpose of land disposition; rather, the report concluded the revenue was a collateral, albeit appreciated, benefit of the enactments.[3]

It is urged that even if conveyances pursuant to the 1868 and 1870 acts passed trust-free title, grantees and their successors were required to reclaim their land within a reasonable time or suffer reinstatement of the trust. Nothing in the deed or statute warrants implication of such a condition subsequent. Moreover, conditions subsequent are disfavored because they may result in forfeiture. (*MacDonald Properties, Inc.* v.

---

[3]After a lengthy discussion of the navigational purposes of the tideland trust, the state's power to terminate the trust, and the nature of a private owner's possession of such land after sale, Senator Haymond ended his report with a brief statement concerning revenue: "If rumor is to be credited, these lands have been a fruitful source of corruption and have been made the foundation of gigantic lobby schemes—the State has been despoiled of her interest in valuable portions of them, and the time has arrived that an end should be put to schemes that grow out of their retention by the State. Whilst the Legislature has the power to give them away lot by lot to private parties, it has not the moral right to so dispose of them. Our State is burdened with a debt of five millions of dollars and the people are weighed down by taxation. [¶] If these lands are sold under the provisions of the Farish bill, the State will receive into her Treasury more than a million of dollars." (Report, *supra*, at p. 10.)

*Bel-Air Country Club* (1977) 72 Cal.App.3d 693, 699 [140 Cal.Rptr. 367].) The condition subsequent would cause manifest injustice to those who—relying on *Knudson*—filled land and built upon it, and those who paid real property taxes over the past 100 years.

The principle case relied on by the majority to establish the condition subsequent theory (*People* v. *Williams* (1884) 64 Cal. 498 [2 P. 393]) holds merely that an offer to dedicate land for construction of specified improvements is not effective to create a public easement until the offer has been accepted and the improvements made. This and other cases cited by the majority furnish no basis for concluding all grants of tidelands are necessarily subject to conditions subsequent.

CONCLUSION

We should reaffirm the holding that conveyances pursuant to the 1868 and 1870 acts passed title free from the trust. This does not suggest that owners of submerged lands may reclaim their property free from pertinent federal, state and local regulation. Tidelands—whether free or subject to the trust—remain subject to regulation as to *whether* they may be filled (Gov. Code, § 66600 et seq.; *People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 544 [72 Cal.Rptr. 790, 446 P.2d 790]; *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 570-573 [89 Cal.Rptr. 897]), and while the lands remain submerged or become flooded by navigable waters, they are subject to the public's right to fish and pass over them. (*Bohn* v. *Albertson* (1951) 107 Cal.App.2d 738, 748 et seq. [238 P.2d 128].)[4]

Rather than condemning the Legislature's fundamental policy encouraging private parties to dredge and fill tidelands to permit public and private harbor development, we should recognize the determination greatly furthered the purposes of the trust. The bay has been developed permitting widespread public access according to long settled rules. We should not now attempt to impeach those rules, the legislative determi-

---

[4]My conclusion that we should adhere to *Knudson* requires denial of mandate, and it is unnecessary to reach the alternate ground relied upon by the trial court in granting the motion for partial summary judgment. Although the parties had not raised the matter, the trial court concluded that the state was collaterally estopped to claim that conveyances pursuant to the 1868 and 1870 acts were not free of the trust. The court relied upon *Alameda Conservation Assn.* v. *City of Alameda, supra,* 264 Cal.App.2d 284, 287, where the state successfully took the position that *Knudson* should be followed and such conveyances were free of the trust.

nation establishing them, or this court's affirmance of them. We should embrace our heritage and be thankful for it.

Public policy as to development of San Francisco Bay may have changed as the majority suggest, but this furnishes no basis for impeaching the legislative determinations of 1868 and 1870 to terminate the trust as to portions of the tidelands and submerged lands in furtherance of trust purposes. The program has been too successful to be condemned by judicial fiat, and the need to promote commerce and harbor development is as great now as ever.

Moreover, it is for the Legislature and not this court to determine policy. The Legislature has made it clear that "private investment in shoreline development should be vigorously encouraged" in San Francisco Bay. (Gov. Code, § 66605.1.)[5]

Mandate should be denied.

Richardson, J., and Manuel, J., concurred.

The petition of real parties in interest for a rehearing was denied March 27, 1980, and the opinion was modified to read as printed above. Clark, J., Richardson, J., and Manuel J., were of the opinion that the petition should be granted.

---

[5]Government Code section 66605.1 provides: "The Legislature finds that in order to make San Francisco Bay more accessible for the use and enjoyment of people, the bay shoreline should be improved, developed and preserved. The Legislature further recognizes that private investment in shoreline development should be vigorously encouraged and may be one of the principal means of achieving bay shoreline development, minimizing the resort to taxpayer funds; therefore, the Legislature declares that the commission should encourage both public and private development of the bay shoreline."

Section 66606 provides: "The Legislature hereby finds and declares that this title is not intended, and shall not be construed, as authorizing the commission to exercise its power to grant or deny a permit in a manner which will take or damage private property for public use, without the payment of just compensation therefor. This section is not intended to increase or decrease the rights of any owner of property under the Constitution of the State of California or the United States."